**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Baltimore Division)**

| | | |
|---|---|---|
| In re: | * | |
| | | Chapter 11 |
| **TMST, Inc.** | * | |
| **f/k/a Thornburg Mortgage, Inc.,** *et al.,* | | Case Nos. 09-17787, 17790-17792-DWK |
| | * | |
| Debtors. | | (Jointly Administered under |
| | * | Case No. 09-17787) |

\* \* \* \* \* \* \*

| | | |
|---|---|---|
| **JOEL I. SHER,** | | |
| **CHAPTER 11 TRUSTEE,** | * | |
| | | |
| Plaintiff, | * | Adversary No. _____ |
| | | |
| v. | * | |
| | | |
| **LARRY A. GOLDSTONE** | * | |
| **8 Santo Domingo Circle** | | |
| **Santa Fe, New Mexico 87507** | * | |
| | | |
| **CLARENCE G. SIMMONS III** | * | |
| **254 Tano Road** | | |
| **Santa Fe, New Mexico 87507** | * | |
| | | |
| **DEBORAH J. BURNS** | * | |
| **2596 Tano Compound Drive** | | |
| **Santa Fe, New Mexico 87506** | * | |
| | | |
| **AMY PELL** | * | |
| **2862 Puebla Jacona** | | |
| **Santa Fe, New Mexico 87507** | * | |
| | | |
| **SAF FINANCIAL, INC.** | * | |
| **c/o Corporation Trust** | | |
| **1209 Orange Street** | * | |
| **Wilmington, Delaware  19801** | | |
| | * | |
| **KAREN A. DEMPSEY** | * | |
| **405 Howard Street** | | |
| **San Francisco, California 94105** | * | |
| | * | |

**and**

**ORRICK, HERRINGTON &**          *
**SUTCLIFFE LLP**
**405 Howard Street**             *
**San Francisco, California 94105**
                                 *

Defendants.
\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

## **TRUSTEE'S COMPLAINT FOR DAMAGES AND OTHER RELIEF**

Joel I. Sher, Chapter 11 Trustee (the "Trustee" or "Plaintiff") for (i) TMST, Inc. ("TMST") f/k/a Thornburg Mortgage, Inc., (ii) TMST Acquisition Subsidiary, Inc. f/k/a Thornburg Acquisition Subsidiary, Inc. ("TAS"), (iii) TMST Home Loans, Inc. f/k/a Thornburg Mortgage Home Loans, Inc. ("TMHL"), and (iv) TMST Hedging Strategies, Inc. f/k/a Thornburg Mortgage Hedging Strategies, Inc. ("TMHS") (collectively, the "Debtors"), hereby brings this proceeding against Larry A. Goldstone ("Mr. Goldstone"), Clarence G. Simmons III ("Mr. Simmons"), Deborah J. Burns ("Ms. Burns"), Amy Pell ("Ms. Pell"), SAF Financial, Inc. ("SAF"), Karen A. Dempsey ("Ms. Dempsey") and Orrick, Herrington & Sutcliffe, LLP ("Orrick"), stating:

## **Introduction**

Faced with an impending bankruptcy, two of the Debtors' senior officers, together with one of the Debtors' most trusted attorneys, embarked upon a multi-faceted conspiracy in which they converted substantial amounts of the Debtors' cash, proprietary and confidential information and used the Debtors' personnel and fixed assets to start up a secret new business venture, the concept for which was first developed by the Debtors as a way to avoid financial ruin. Along the way, the Defendants provided TMST's Board of Directors and restructuring professionals with misrepresentations and half-truths, and failed to candidly disclose material

facts, all in order to try and obtain the blessings of the Board of Directors and those professionals for certain actions that the Defendants took in implementing their secret venture.

Among other things, the Defendants (i) amended a management agreement between TMST and TMAC in order to transfer millions of dollars to TMAC and then lied to the board about the reason for the amendment, (ii) needlessly paid hundreds of thousands of dollars to vendors so that the vendors' products would be available for their new venture, (iii) illegally paid themselves hundreds of thousands of dollars in unauthorized bonuses on the eve of bankruptcy, (iv) secretly transferred the Debtors' confidential and proprietary information to their new venture, (v) used millions of dollars of the Debtors' work product for their new venture without compensating the Debtors, (vi) used the Debtors' employees and resources post petition to start up their new venture, (vii) paid themselves excessive post petition salaries while they were primarily engaged in promoting their new venture, and (viii) engaged in a grand scheme to hide and cover up their actions.  The Trustee hereby seeks redress for the millions of dollars in damages the Defendants' actions have caused the Debtors.

### Parties, Jurisdiction and Venue

1.      Plaintiff Joel I. Sher is the Court-appointed Chapter 11 Trustee for the Debtors.

2.      Defendant Goldstone is a resident of the state of New Mexico and was a Director, the Chief Executive Officer and President of TMST.  In addition Goldstone was the Chairman of the Board of TMHL, Chairman and Chief Executive Officer of TMHS and a Director of TAS.

3.      Defendant Simmons is a resident of the state of New Mexico and was the Senior Executive Vice President and Chief Financial Officer of TMST. In addition, Simmons was a Director and Chief Financial Officer of TMHL, a Director and Chief Financial Officer of TMHS and a Director of TAS.

4.      Defendant Burns is a resident of the state of New Mexico and was the Senior Vice President of Structured Finance of TMST, as well as one of TMST's assistant secretaries.  In addition Burns was the Secretary of TMHL and the Secretary of TMHS.

5.      Defendant Pell is a resident of the state of New Mexico and was the Senior Vice President and Director of Investor Relations and Corporate Communications for TMST.

6.      Defendant SAF is a corporation organized under the laws of the state of Delaware, with its principal place of business in Santa Fe, New Mexico.

7.      Defendant Dempsey is a resident of the state of California and a partner in the law firm of Orrick, Herrington & Sutcliffe LLP.  Dempsey was Assistant Secretary for TMST and served as counsel to the Debtors, both before and after they filed their respective Chapter 11 cases.

8.      Defendant Orrick, Herrington & Sutcliffe LLP ("Orrick"), is a law firm that is registered as a Limited Liability Partnership under the laws of the state of California and is registered as a Foreign Limited Liability Partnership under the laws of the state of Maryland.

9.      This Court has jurisdiction over the subject matter of this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 and 11 U.S.C. §§ 105, 330, 323, 544, 548, 549, 550 and 1107.

10.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (E), (H), (E) and (O).

11.      Venue in this Court is proper pursuant to 28 U.S.C. § 1409.

## Allegations Common to All Counts

**Procedural Background**

12.    On May 1, 2009 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  On May 6, 2009, the Court entered an order providing for the joint administration of the Debtors' cases.

13.    On May 22, 2009 the Bankruptcy Court entered an Order Granting Application Pursuant To Section 327(a) of the Bankruptcy Code and Rules 2014 and 2016 of the Federal Rules of Bankruptcy Procedure For Authorization to Employ Orrick, Herrington & Sutcliffe LLP as Special Counsel to the Debtors ("Orrick Retention Order") [Docket No. 112].  Pursuant to the terms of the Orrick Retention Order, the Debtors were authorized to employ and retain, effective as of the Petition Date, Orrick as Special Counsel to the Debtors pursuant to 11 U.S.C. § 327(e).

14.    On September 16, 2009, the Office of the United States Trustee (the "UST") filed a Motion for an Order Directing the Appointment of a Chapter 11 Trustee (the "Trustee Motion") [Docket No. 362].

15.    On October 23, 2009, the Bankruptcy Court granted the Trustee Motion and entered an Order Requiring Appointment of Chapter 11 Trustee [Docket No. 490].

16.    On October 28, 2009, on application of the UST, the Bankruptcy Court entered an Order Approving Appointment of Joel I. Sher as Chapter 11 Trustee [Docket No. 506].

17.    At all time relevant hereto, each of the Debtors was insolvent as that term is defined in 11 U.S.C. § 101(32).

18.    The Defendants Mr. Goldstone,  Mr. Simmons,  Ms. Burns, Ms. Pell and Ms. Dempsey were, at all times relevant hereto, insiders of the Debtors as that term is defined in 11 U.S.C. § 101(32)(B) and (E).

**The Business of the Debtors and Their Management**

19.     TMST is a public-traded entity that was founded in 1993.  TMST is a corporation that was incorporated under the laws of the state of Maryland, with its principal place of business in Santa Fe, New Mexico.  TMST conducted its operations as a real estate investment trust ("REIT") for income tax purposes.  Until it was delisted in December, 2008, TMST's common stock was traded on the New York Stock Exchange.  TMST was, up to the Petition Date, an externally managed REIT. The remaining Debtors are wholly-owned direct or indirect subsidiaries of TMST.

20.     TMHL is a taxable REIT wholly-owned subsidiary of TMST. TMHL is a corporation that was incorporated under the law of the state of Delaware, with a principal place of business in Santa Fe, New Mexico.  Prior to the Petition Date, TMHL originated**,** acquired, securitized and serviced residential mortgage loans. TMHL was engaged in business as a single family residential mortgage lender operating in all 50 states.  TMHL focused principally on the jumbo and super-jumbo segment of the hybrid/adjustable rate mortgage market lending directly to borrowers as well as through relationships with lending partners across the country. As of the Petition Date, TMHL was no longer originating loans although it continued to operate its mortgage servicing business pursuant to servicing agreements with securitization trusts and the owners of certain whole loans.

21.     The remaining two Debtors, TAS and TMHS, did not have ongoing operations on the Petition Date.

22.     During periods prior to the Petition Date, TMST held itself out as focusing principally on high quality residential mortgages and high quality residential mortgage backed securities by acquiring and retaining investments in "ARM/Hybrid Assets." TMST's income was

6

generated primarily from the "net spread," meaning the difference between the interest income it earned on ARM/Hybrid Assets and the cost of borrowings.

23.     TMST's ARM/Hybrid Assets consisted of "Purchased ARM/Hybrid Assets" and "ARM/Hybrid Loans."  Purchased ARM/Hybrid Assets are mortgage-backed securities that represent interests in pools of ARM and Hybrid loans that are publicly rated and issued by third parties including TMHL; they may include guarantees or other third-party credit enhancements against losses from loan defaults.  Generally, ARM/Hybrid Loans are residential mortgage loans that TMHL securitized from its own loan origination or acquisition activities, loans that TMHL used as collateral to support the issuance of collateralized mortgage debt or loans pending securitization.

24.     Prior to the Petition Date, TMST's and TMHL's business, financial, human resources and day-to-day operations were managed by Thornburg Mortgage Advisory Corporation ("TMAC") pursuant to the terms of certain management agreements, as amended from time to time, described below.

25.     While TMAC holds certain investments and other assets, including an interest in the building where the Debtors' principal place of business is located, TMAC's primary source of income was derived from providing services to the Debtors under the terms of the management agreement.  Moreover, one of TMAC's primary business functions was to manage the Debtors' business affairs.

26.     The majority shareholder of TMAC is Garrett Thornburg. Until October 2, 2009, Mr. Thornburg was also Chairman of TMST's Board of Directors.

27.     At all times relevant hereto, Messrs. Goldstone and Simmons held equity interests in and were Managing Directors of TMAC and until May 2009, were authorized signatories for TMAC.

28.     On January 16, 2009, TMST and TMAC entered into an Amended And Restated Management Agreement (the "Amended Management Agreement"), which provided, among other things, that TMST would (i) pay TMAC a monthly base management fee of $2 Million, (ii) pay TMAC incentive compensation subject to certain future events, and (iii) reimburse TMAC within thirty (30) days after the end of each month for documented "Operating Expenses" (as that term is defined in the Amended Management Agreement) that TMAC "reasonably incurred on its behalf in furtherance of its responsibilities" under the Amended Management Agreement during the preceding month. The Amended Management Agreement was signed by Mr. Goldstone on behalf of TMST and Mr. Thornburg on behalf of TMAC.

29.     TMAC and TMST amended the terms of the Amended Management Agreement by letter agreement dated April 8, 2009 (the "Second Amended Management Agreement"). In the Second Amended Management Agreement the parties recite (i) that TMST expects to file for Chapter 11 bankruptcy protection and commence an orderly sale and liquidation of its remaining assets and (ii) that TMAC agrees to forgo any profit and will only obtain reimbursement of its actual costs. The Second Amended Management Agreement was signed by Mr. Goldstone on behalf of TMST and Mr. Thornburg on behalf of TMAC. Under the terms of the Second Amended Management Agreement, TMAC was no longer entitled to receive the $2 Million base monthly management fee. However, TMST was to reimburse TMAC for "Operating Expenses" on the 15th and 30th of each month for expenses incurred during the respective prior two week period. At the time the Second Amended Management Agreement was executed, Mr. Goldstone

8

and Mr. Thornburg were officers and/or directors of both TMST and TMAC and, therefore, sat

on both sides of the agreement.

**The Debtors Begin Exploring the Strategy of Acquiring a Thrift as a Means to Solve Their Looming Financial Crisis**

30.     Beginning in late 2006, slowing home price appreciation coupled with rising

interest rates contributed to increased delinquencies on mortgage loans, including newly

originated mortgage loans and mortgage loans held in securitized mortgage pools and in secured

warehouse lines of credit.   The increased delinquencies and borrower defaults contributed to

mortgage lenders experiencing accelerated repurchase requests from secondary market investors.

31.     By October 2007, TMST's Board of Directors began exploring new business

strategies to alleviate the financial pressures that the downturn in the financial markets was

causing.   One strategy that was considered was the formation of a new holding company that

would acquire TMHL from TMST and thereafter convert TMHL to a federally chartered thrift

bank to enable the Debtors to access the financing necessary to acquire and originate mortgage

loans.

32.     Because they were TMST's two senior officers, Messrs. Goldstone and Simmons

had primary responsibility for the development of the thrift strategy, including working with

outside professionals advising TMST on the strategy.

33.     The Debtors' primary outside legal counsel in the exploration of the thrift strategy

was the law firm of Goodwin Procter, LLP ("Goodwin Procter").   At TMST's October 16, 2007

Board of Directors' meeting, an attorney from Goodwin Procter made a presentation to the

Board concerning the thrift strategy.   Included in that presentation was an outline for obtaining

approval for the formation of a thrift from the Office of Thrift Supervision (the "OTS").   Over

the next one and one-half (1½) years, the Debtors paid over $1.5 Million for Goodwin Procter's services relating to the exploration and pursuit of the thrift strategy.

34.     At a Board of Directors' meeting in December 2007, Mr. Goldstone distributed and reviewed a draft 2008 strategic plan for the Debtors that outlined the thrift strategy that senior management supported.   This plan was based, in large part, upon the knowledge and information that Mr. Goldstone acquired from working with Goodwin Procter (and others) in his capacity as Chief Executive Officer and President of TMST.   Under Mr. Goldstone's proposed structure, TMAC would become a thrift holding company that would acquire and become the majority owner of TMHL, with TMST acquiring up to a ten percent (10%) ownership interest. Thereafter, TMHL would be converted into a fully regulated federally chartered thrift bank (referred to as an "FSB").   The draft 2008 strategic plan contained a detailed plan for the implementation of the thrift.

35.     The draft 2008 strategic plan contained the following statement on each page:

The information contained in this document is strictly confidential, is intended only for the use of the intended recipient, and is the property of Thornburg Mortgage or its affiliates and subsidiaries.  If you are not the intended recipient, you are hereby notified that any use of the information contained in or transmitted with the communication or dissemination, distribution, of copying of this document is strictly prohibited by law.

36.     In January of 2008, Mr. Simmons reported to the TMST Board of Directors that the thrift restructuring they contemplated required changes to a number of the Debtors' accounting systems. To assist in implementing those changes Mr. Simmons also reported that TMST would retain the accounting firm of Deloitte & Touche ("Deloitte").

37.     On or about February 22, 2008, Mr. Simmons, as SEVP and CFO of TMST, executed a letter agreement formally engaging Deloitte to provide consulting services respecting

the financial and regulatory reporting software systems that TMST needed to meet regulatory requirements for the FSB.  Professionals at Deloitte regularly consulted with and provided advice to Mr. Simmons and others at TMST whereby Mr. Simmons and others at TMST learned the types of processes and systems needed to operate a FSB.  Over the next one and one-half (1½) years Deloitte received approximately $500,000 for services it provided to the Debtors.

38.     Throughout 2008 and periods of 2009, Goodwin Procter provided ongoing counsel and confidential information and techniques to, among others, Messrs. Goldstone and Simmons and Ms. Burns with respect to implementing the thrift strategy.

39.     In their capacity as senior officers of TMST, Messrs. Goldstone and Simmons had extensive involvement with Goodwin Procter in virtually every phase of the attempt to implement the thrift strategy.  Among other things, Messrs. Goldstone and Simmons, with the assistance of Goodwin Procter: (i) assisted in the compilation of confidential business plans and methods, (ii) drafted confidential materials for presentation to the OTS, (iii) attended meetings with representatives of the OTS, (iv) worked with Ms. Burns on the application for OTS approval, (v) compiled due diligence material concerning several existing banks that were targets for acquisition as one method to implement the thrift strategy, (vi) reviewed confidential memoranda prepared by Goodwin Procter concerning the corporate structure for and the approval process related to the FSB, (vii) considered various options for obtaining FSB approval, (viii) reviewed regulatory issues, (ix) reviewed and worked on confidential acquisition and merger agreements when a target bank was identified, and (x) conducted due diligence on the capital needs and structure for the FSB.

40.     After the pursuit of the thrift strategy had begun, in March 2008 TMST entered into an Override Agreement with certain repo counterparties as a result of ongoing margin calls.

Under the terms of the Override Agreement, TMST believed it had obtained, among other things, an agreement that the counterparties would not invoke margin calls for a 364-day period, or until March 16, 2009.  The Override Agreement was amended in December 2008.

41.     As a result of the information and knowledge they gained working on the thrift strategy, Messrs. Goldstone and Simmons concluded by September 2008 that acquiring an existing bank was a preferred way to implement the thrift strategy.  Therefore, at the September 2008 Board of Directors meeting, Mr. Simmons advised the board that the company was already in preliminary negotiations to acquire a small financial institution, namely Union Bank, located in Albuquerque, New Mexico.  On or about November 6, 2008, TMST entered into a confidential agreement with Union Financial Corporation (the holding company of Union Bank) providing for an exclusive period to negotiate a transaction between the companies. TMST began referring to the potential acquisition of Union Bank as "Project Upsilon."

42.     On November 25, 2008, Messrs. Goldstone and Simmons and counsel from Goodwin Procter attended a meeting in Dallas, Texas with representatives of the OTS during which Messrs. Goldstone and Simmons provided the OTS with a confidential, written presentation concerning TMST's proposal to acquire a thrift *via* a reverse-merger and thereafter convert it to an FSB.  In the written presentation, TMST requested that the OTS treat the information contained therein as confidential and exempt from disclosure under the Freedom of Information Act because the "confidential information includes confidential commercial and financial information…."

43.     At the January 26, 2009 meeting of the TMST Board of Directors, Mr. Simmons distributed a copy of a draft merger agreement with Union Bank, which he identified as a financial institution that could be acquired in conjunction with receipt of OTS approval. The

12

agreement, which Goodwin Procter drafted, bore the header "GP Draft 1/23/09" and was entitled "Agreement And Plan Of Merger By And Among Thornburg Mortgage, Inc., Upsilon Merger Subsidiary, Inc., [Upsilon Financial Corporation] And [_____] As The Shareholder's Representative."

44.     The draft merger agreement had already been provided to Union Bank in furtherance of the negotiations between TMST and Union Bank.  Mr. Simmons handled those negotiations on behalf of TMST and Samuel K. Collins, Jr. handled them on behalf of Union Bank.

45.     The negotiations between TMST and Union Bank continued into 2009, with Goodwin Procter and counsel to Union Bank making various revisions to the draft merger agreement and related documents and circulating them to the parties.

46.     Part of the thrift strategy that Messrs. Goldstone and Simmons contemplated pursuing on behalf of TMST required raising substantial new capital, as well as obtaining certain agreements from the counterparties to the Amended Override Agreement. However, by the beginning of March 2009, TMST had not obtained OTS approval and Messrs. Goldstone and Simmons were acutely aware that the termination date of the Override Agreement (March 16, 2009) was looming.

**Realizing That The Debtors Were Likely to File Bankruptcy, Messrs. Simmons and Goldstone Directed TMST To Make Improper Payments**

47.     Beginning in February 2009 and continuing through March 2009, the Debtors engaged the counterparties to the Amended Override Agreement in negotiations to further extend its termination date.   As part of those negotiations, Mr. Goldstone proposed that the

counterparties participate in and make their mortgage backed securities available to fund a TMST controlled FSB.

48.     During the weekend of March 7th and 8th, 2009, the Debtors met with certain of the counterparties to the Amended Override Agreement (along with their respective counsel) in New York City to continue those negotiations.  By the end of that weekend, the Debtors became aware that at least two of the counterparties (UBS and Citibank) would likely not go along with the thrift strategy restructuring proposal and wanted to liquidate their respective collateral.

49.     On Sunday March 8, 2009, Ms. Dempsey sent an email to Mr. Goldstone and others discussing the status of those negotiations and suggested that unless the Debtors were able to get all five counterparties to either forbear or extend the Amended Override Agreement, a voluntary chapter 11 filing prior to the expiration of the Amended Override Agreement might be necessary.

50.     Fearing that a bankruptcy filing was imminent, Mr. Simmons, early the next morning of March 9, 2009 directed his assistant to immediately process his expenses for reimbursement from TMST, including billing TMST a hotel rate ($500.00 per night) for his use of his wife's apartment in New York City.

51.     Having taken care of himself first, Mr. Simmons later that same morning authorized and directed TMST to pay (i) $2 Million to TMAC for its February 2009 base management fee and (ii) another $2 Million to TMAC to pre-pay its March 2009 base management fee.  Thus, on March 9, 2009, TMST made two separate wire transfers in the amount of $2 Million each to TMAC.  Simmons pre-paid the yet un-earned March 2009 management fee in advance even though the terms of the Amended Management Agreement

provided that the monthly management fee was payable within thirty days after the end of each such month.

52.     During that same week, TMST began working on bankruptcy planning with its outside restructuring counsel and within days thereafter began paying millions of dollars in fees to various professionals, including the payment of a $750,000 retainer to Orrick.  Also within the next week, TMST paid a $650,000 retainer to Goodwin Procter and a $165,000 retainer to Ketchum (see discussion below).

53.     On March 16, 2009, the expiration date of the Amended Override Agreement, the counterparties and the Debtors were able to enter into forbearance agreements pursuant to which the counterparties agreed to forbear until March 31, 2009 from demanding payment or exercising remedies under their respective financing agreements.

**Messrs. Goldstone and Simmons Develop Their Secret Plan for a "Goldstone/Simmons NEWCO"**

54.     Messrs. Goldstone and Simmons privately agreed, no later than this initial forbearance period, that if the remaining counterparties would not agree to their proposal, a "Goldstone/Simmons NEWCO" would pursue the FSB approval and raise the capital needed to accomplish the FSB formation.  Messrs. Goldstone and Simmons did not intend to pursue Goldstone/Simmons NEWCO on behalf of the Debtors or in their capacity as officers and directors of the Debtors; rather they intended to pursue it individually, for their own economic gain.

55.     By the last week of March 2009, Goldstone became aware that the counterparties who had not previously rejected his restructuring proposal, were likely to reject it and seek to realize on their collateral.  At a Special Meeting of the TMST Board of Directors held via

telephonic conference on Sunday March 29, 2009 at 5:00 PM Mountain Time (also attended by Mr. Simmons and Ms. Dempsey), Mr. Goldstone advised the board that Credit Suisse (one of the remaining counterparties) was not willing to continue financing TMST and would likely seek to realize on its collateral.

56.     Up to this point in time, the Debtors had been using the law firm of Kirkland & Ellis ("Kirkland") to provide restructuring and bankruptcy planning advice.  During the March 29, 2009 Board of Directors meeting, Kirkland advised the Board that Delaware would be the most advantageous venue for a Chapter 11 filing and that the law firm of Pachulski Stang Ziehl & Jones, LLP ("Pachulski") had been retained to serve as local counsel.  In fact, Mr. Goldstone had signed an engagement letter with Pachulski weeks earlier on March 15, 2009. TMST wired Pachulski a $250,000.00 retainer on March 13, 2009 and another $1 Million retainer on March 31, 2009.  Pachulski later returned all but $178,000.00 of its retainer.

57.     Thus, in March 2009, Messrs. Goldstone and Simmons were aware that it was likely that the Debtors would not be able to continue as ongoing businesses and would have to wind up their affairs.  They then moved forward with their secret plan to form "Goldstone/Simmons NEWCO" with Ms. Burns, Ms. Pell and Ms. Dempsey.  No later than this point in time, Messrs. Goldstone and Simmons were engaged in a pattern of self-dealing, misrepresentation, non-disclosure of facts, unauthorized payments to parties they thought would promote NEWCO and improperly using the Debtors' funds and assets for their own benefit without giving any value to the Debtors.

58.     On April 1, 2009, TMST sent Orrick three wire transfers in the aggregate amount of $558,016.72 for services rendered through March 27, 2009.   These payments were in addition to the $750,000 retainer TMST provided Orrick earlier in the month.  On April 29, 2009, Orrick

applied $415,466.56 from the retainer for services rendered through April 29, 2009. After the Petition Date, and without an order of the Bankruptcy Court, Orrick reported that it applied $24,229.58 against the retainer for pre-petition services. Lastly, after the Petition Date, Orrick applied $163,817.89 against the retainer for post-petition services. Thus, during the month preceding the Petition Date and through the date of the filing of this Complaint, Orrick received the aggregate approximate sum of $1,161,000 from TMST.

**Messrs. Goldstone and Simmons Secretly Have Unauthorized Bonus Payments Made to Themselves and Three of the Other Future Founders of SAF**

59.     Notwithstanding their full knowledge of the Debtors' dire financial condition, in the days prior to the March 29, 2009 Board of Directors meeting, Messrs. Goldstone and Simmons secretly conspired to have unauthorized "bonuses" paid to themselves, Ms. Burns and Ms. Pell (both of whom would later obtain founders' stock in SAF along with Messrs. Goldstone and Simmons). They agreed that Mr. Goldstone would receive $140,000.00, Mr. Simmons $92,000.00, Ms. Burns $53,000.00 and Ms. Pell $40,000.00 (plus payroll taxes). To ensure these payments remained secret, Mr. Goldstone cautioned Mr. Simmons that the payments were "..highly confidential. Not even Shawn B. can know from a cash flow forecasting perspective." Shawn B was a reference to Shawn Buniel, a vice president of financial planning and analysis at TMST, whose job was to track and forecast the Debtors' cash flows.

60.     TMAC still employed and paid all of the Debtors' employees at this time. Therefore, Mr. Goldstone contacted Brian Cesare, a human resources person responsible for handling TMAC/TMST's payroll, in order to make the unauthorized payments. On Sunday March 29, 2009, at approximately 4:00 PM Mountain Time, Mr. Goldstone by email directed Mr. Cesare to make the payments and cautioned: "Four checks approved. Delete PF. SSSHHH!"

On the Board call that began approximately one hour later, Mr. Goldstone did not mention these secret payments.   Mr. Goldstone did not seek or obtain approval for these payments from either TMST's Board of Directors or its Compensation Committee, in violation of company policy.

61.    Mr. Cesare sought approval from Mr. Thornburg for these payments and thereafter the unauthorized payments in the aggregate amount of $338,092.00 (inclusive of taxes paid as a result of the "bonus payments") were paid to Messrs. Goldstone and Simmons, Ms. Burns and Ms. Pell. The next regularly scheduled ADP payroll was April 15, 2009.  However, these unauthorized "bonuses" were paid by a special, out of the ordinary course ADP payroll on April 3, 2009, that did not contain any regular payroll payments to any other person.

62.    On April 15, 2009, with the authorization of Messrs. Simmons and Goldstone, TMST reimbursed TMAC for the unauthorized bonus payments. Messrs. Goldstone and Simmons later relied on these unauthorized bonus payments to justify the amount of their post-petition salaries paid to them by TMST.

**In Order to Preserve Their Funding Source for NEWCO, Messrs. Goldstone and Simmons and Ms. Dempsey Scheme to Amend the TMAC Management Agreement**

63.    In the latter part of March 2009, Mr. Simmons once again sought to pre-pay TMAC's base management fee for the upcoming month of April. In response to Ms. Burn's request for approval of that pre-payment, a restructuring attorney at Kirkland advised Ms. Burns and Mr. Simmons that TMST should not pay the April management fee (which was not due until May) until after TMST filed its Chapter 11 case and had obtained express approval from the bankruptcy court.

64.    As hereinafter discussed, Messrs. Goldstone's and Simmons' concerns about TMST's ability to continue paying TMAC, and the possibility that creditors and/or the

bankruptcy court would block and/or claw-back any such payments, began overshadowing and directing their decisions for TMST.

65.     On March 31, 2009, the counterparties and the Debtors agreed to enter into amended forbearance agreements pursuant to which the counterparties would forbear from taking certain actions through April 30, 2009. Under the terms of the amended forbearance agreements the counterparties were allowed, among other things, to sell or otherwise dispose of the collateral allegedly securing their respective financing agreements.

66.     At a Board of Directors meeting on March 31, 2009 (attended by Messrs. Goldstone and Simmons and Ms. Dempsey), Mr. Goldstone advised the Board of Directors that he had asked the counterparties for another thirty-day forbearance period so that the Debtors could engage in an orderly wind down.  The Board of Directors then authorized the execution of the amended forbearance agreements.  The Board of Directors (having obtained guidance from restructuring counsel) also discussed proposed public disclosures about their decision to engage in an orderly wind down and the probable filing of chapter 11 cases. Shortly thereafter, the Debtors made that public disclosure.

67.     The March 31, 2009 Board of Directors meeting concluded at approximately 6:05 p.m. Mountain Time.  By that time, Mr. Goldstone had already solicited Mr. Thornburg to become part of NEWCO or provide funding to NEWCO, either individually or through TMAC. Within several hours after the conclusion of the Board meeting, Mr. Goldstone and Mr. Thornburg began discussing severance payments for employees.  When Mr. Thornburg learned that severance payments for both TMST and TMHL employees could cost several million dollars, on April 3, 2009 he advised Mr. Goldstone that TMAC could not afford to make those

severance payments if TMAC was also going to provide employees and costs to start NEWCO

and be the bank holding company proposed under the TMST thrift strategy.

68.    Early in the morning of April 3, 2009, Mr. Goldstone replied by email to Mr.

Thornburg stating:

> …We are required to give 60 days notice to employees before a layoff according
> to the WARN Act.  So, we are planning on paying that amount as the base
> severance amount.  If we do not pay 60 days then TMAC would be liable for that
> amount anyway, so we need to pay it.  The additional complication is the
> Management Agreement.  It reimburses TMAC for TMHL expenses in arrears
> after the end of the month.  So, the TMHL severance expenses would not be
> reimbursable if we file for bankruptcy before May 1. That reimbursement if it
> were not consistent with the TMAC Management Agreement could be clawed
> back, plus we would be subject to judicial action as insiders that did something to
> benefit ourselves to the detriment of the creditors….

> …There is a lawyer call this morning to discuss this matter further to try and
> determine a way around this. Paul Fish, KE, Pachulski and Orrick are going to
> discuss this. Amending the management agreement is risky; paying the
> reimbursable early is a risk because it is inconsistent with the contract, getting
> advance agreement from our major creditors is under consideration, but the best
> option may be to delay a bankruptcy filing until May 1 at the close of business.
> We would reimburse TMAC early that day, which would be consistent with the
> contract, and then file….

> ….I also agree that compensating TMAC with stock in NEWCO as a way to pay
> back the start up expenses as well as pay for the intellectual property is a good
> option…

69.    Shortly thereafter, Mr. Goldstone forwarded to Ms. Dempsey and TMAC's

outside counsel, Paul M. Fish, Esq., a copy of his April 3, 2009 email to Mr. Thornburg noting:

> After thinking about this over night I think the best choice is to take our chances
> on delaying our filing until May 1. Before filing we would reimburse TMAC for
> its April expenses and pay its base management fee consistent with the contract.

70.    Later in the day on April 3, 2009, Ms. Dempsey sent an email to Mr. Goldstone

saying: "…Just got off a really ugly call re TMAC."  Mr. Goldstone then inquired "what about

dumping Pachulski and filing in md or nm?"

71.     Mr. Fish who had been on the same call as Ms. Dempsey, sent an email later that day to Messrs. Goldstone and Thornburg reporting that:

> …just had a pretty uncomfortable discussion with TMA Delaware bankruptcy lawyer.  Their first position was that TMAC should just pay the severance pay, pay the expenses to run TMAC for this month, transfer to TMA whatever employees TMA decides it wants and then TMAC would have a worthless unsecured claim for what is owed…
>
> …The only real protection for TMAC will be bankruptcy court approval of a deal.  However, every day that goes by TMAC's out of pocket goes up and its bargaining position goes down. Not pretty.

72.     In response to Mr. Fish's email, Mr. Thornburg replied to Messrs. Fish and Goldstone:

> It is clear that we can not make these payments from TMAC and expect to get our money back.  Let's amend the management agreement now and pay it now.  A bird in the hand is better.

73.     By the end of day on April 3, 2009, Ms. Dempsey scheduled a call with the Venable law firm to begin the process of engaging Venable as the Debtors' restructuring and bankruptcy counsel and terminating Pachulski (as Goldstone had discussed hours earlier).

74.     Two days later, on April 5, 2009, during an executive session of a special meeting of the Board of Directors (at which Ms. Dempsey and Mr. Goldstone were present), the Board discussed the selection of new bankruptcy counsel.  By April 8, 2009, Pachulski (who had stood in the way of Goldstone's scheme to protect TMAC and his NEWCO investment) was terminated and Venable was hired as new bankruptcy counsel.  Kirkland, who at one point had also counseled the Debtors against paying TMAC any management fees without bankruptcy court approval (and who had already decided not to represent the Debtors in a bankruptcy filing) was terminated shortly thereafter.

21

75.     Notwithstanding his concern about the risk in amending the Amended Management Agreement, Mr. Goldstone began discussing doing just that with Dempsey and Mr. Fish. Those discussions dealt not only with the WARN Act reimbursement issue that Mr. Goldstone (under his TMAC "hat") had discussed with Mr. Thornburg, but also how TMAC could gain control over of the equipment and software licenses that TMST and TMHL owned or used and NEWCO now needed.

76.     On April 8, 2009, Mr. Goldstone, after working on a draft of revisions to the Amended Management Agreement with Ms. Dempsey, advised Mr. Fish and Mr. Thornburg that the latest draft of the document (prepared by Orrick, Ms. Dempsey's firm) provided that the expense reimbursement to TMAC would be pre-approved and subject to review by TMST's "Comp Committee" with adjustments to be made during the next reimbursement period so that TMAC would not have to wait for reimbursement. The draft also required TMST to pay TMAC a $500,000.00 retainer.

77.     Ms. Dempsey, Mr. Fish and Mr. Goldstone continued drafting revisions to the Amended Management Agreement that were designed to appear as if TMAC was giving something up. In reality, in a scheme concocted by Mr. Goldstone, the amendments were designed to reimburse TMAC for accelerated lump sum WARN ACT payments and still allow TMAC to control the Debtors' equipment and software.  As Mr. Fish "eloquently" stated in an April 8, 2009 email to Messrs. Goldstone and Mr. Thornburg:

> I think the way Karen re-wrote the Section 18 language ought to solve the problem.  The termination fee remains for purposes of § 18(e). If TMA wants the computers, they have to pay $36 million if there is no cause for termination.  (See revised version that corrected the glitch).  That makes the Maryland guys happy. TMA is "giving up" anything [sic].  Cosmetics.

78.     Later in the evening on April 8, 2009, at a special meeting of the Board of
Directors, Mr. Goldstone and Ms. Dempsey discussed the WARN Act issue and provided the
Board with a copy of the draft revision to the Amended Management Agreement.  Mr. Goldstone
misrepresented to the Board that the intent of the amendments was to provide for reimbursement
of expenses only and to eliminate any profit to TMAC "for the benefit of creditors."   Mr.
Goldstone failed to advise the board and the Debtors' new bankruptcy counsel that he was
implementing the revisions to insure that TMAC would fund his secret NEWCO plan, based on
Mr. Thornburg's insistence that TMAC would not fund NEWCO if TMAC ran the risk of not
getting reimbursed for employee severance payments prior to the Chapter 11 filings.

79.     At the April 8, 2009 Board of Directors meeting, notwithstanding the ethical duty
and duty of loyalty Ms. Dempsey owed to TMST and her actual knowledge of the reason for the
revisions to the Amended Management Agreement, Ms. Dempsey did not contradict Mr.
Goldstone's statements, did not provide candid counsel to her clients (the Debtors) who had
engaged her and to whom her duties flowed, and gave the board advice and counsel based on
misrepresentations and non-disclosures. Against this backdrop, Ms. Dempsey provided the
Board of Directors with her opinion that the accelerated lump sum WARN Act payments by
TMAC were reimbursable by TMST, even though a contrary reading of the Amended
Management Agreement dictated the opposite result.

80.     Furthermore, at the April 8, 2009 Board of Directors meeting, neither Mr.
Goldstone nor Ms. Dempsey advised anyone at the Board meeting that "TMA Delaware
bankruptcy lawyer," Pachulski, had advised them that TMAC should pay the WARN Act
payments and TMST expenses.

81.     Based on the carefully orchestrated, limited, deceptive presentation Mr. Goldstone made that corporate counsel Ms. Dempsey failed to refute, the Board of Directors approved the revisions.  On April 8, 2009, Mr. Goldstone and Mr. Thornburg executed the Second Amended Management Agreement.  Shortly before that meeting, TMAC fired substantially all of the employees who had been providing services to TMST and immediately thereafter TMST hired those same employees back.

82.     As Mr. Fish correctly noted, the only true substantive change to the Amended Management Agreement (forgoing the base monthly management fee) was nothing more than "cosmetics."  Once TMAC fired all of the employees and paid them lump sum WARN Act payments, TMAC was no longer providing full management services to TMST and was therefore no longer entitled to the $2 Million per month base management fee.  On the other hand, TMST now had to reimburse TMAC in full for the expenses formerly covered by the base management fee, including payroll costs for the same employees TMST had to hire back.  In fact, during the month of April 2009, TMST paid TMAC approximately $950,000 for expenses that were previously covered by the base management fee.

83.     Thus, in a nine (9) day period Mr. Goldstone, with Ms. Dempsey's full participation, cleverly paved the way for TMST to reimburse TMAC pre-petition for accelerated lump sum WARN Act payments in order to solve his NEWCO funding problems.  Mr. Goldstone and Ms. Dempsey also succeeded in sacking the bankruptcy counsel who stood in the way of their scheme.

84.     Rather than simply giving the 60-day WARN Act notice and paying employees in the ordinary course for 60 days to assist in the wind down of the Debtors, on April 15, 2009 TMAC made lump sum WARN Act payments to 109 employees in the aggregate amount of

$1,717,196.00. That same day TMST reimbursed TMAC for this payment by a wire transfer, notwithstanding that the Second Amended Management Agreement did not require the payment to be made until April 30, 2009.

85.     On April 30, 2009, TMAC paid lump sum WARN Act payments to another 13 employees in the aggregate amount of $324,725.00, which TMST immediately reimbursed to TMAC on the same day by a wire transfer.  Included in the second round of purported sixty (60) day WARN Act payments were payments to: Mr. Goldstone in the amount of $68,205.08, Mr. Simmons in the amount of $51,153.08, Ms. Burns in the amount of $34,153.67, Ms. Pell in the amount of $30,343.16 and Mr. Charles MacIntosh, (who was also one of the founders of NEWCO) in the amount of $46,038.42.

86.     Mr. Goldstone knew that TMAC was not required to make accelerated lump sum WARN Act payments (equal to 60 days salary) and that TMAC could have complied with the WARN Act requirements by simply providing employees with a sixty (60) day notice of impending termination. As advised by Pachulski, TMAC could then have attempted to obtain an order from the bankruptcy court authorizing TMST to reimburse TMAC for payroll expenses if they were otherwise justified and allowable under the Amended Management Agreement (which they were not).  However, Messrs. Goldstone and Simmons understood that there was substantial profit built into the base monthly management fee and they were not willing to take the risk that creditors or the bankruptcy court would block those fee payments or the WARN Act payments; rather they decided to take matters into their own hands, which actions defrauded creditors and the bankruptcy court.

87.     Mr. Goldstone had a direct conflict of interest in his simultaneous capacities for TMST and TMAC.  By taking actions that were in his own best interest, resulting in personal

economic gain to himself and TMAC to the Debtors' detriment, he wholly disregarded his duty of loyalty to TMST and the Debtors. As Mr. Goldstone told Mr. Thornburg in an email on April 30, 2009:

> In response to your last email, the reason that we terminated all TMAC employees today and paid them their WARN Act compensation today was to eliminate, or minimize, expense and exposure to creditors and TMAC respectively. Otherwise, we would have had continuing employees at TMAC continued to pay them for an unknown period of time, still be subject to WARN Act expense reimbursement which would have been dealt with in bankruptcy. This way it is resolved before we get to court, we have reduce expenses at TMAC even further, and TMA can argue that they have a benefit because they control their employee needs going forward. So, I think it works.

88.     Over a thirty day period, in an unchecked frenzy of self-dealing and wanton and reckless breach of fiduciary duty and loyalty, Messrs. Goldstone and Simmons caused TMST to make payments to themselves and their cohorts in the aggregate amount of $842,000.00, and secured over $2 Million in payments for TMAC before the Petition Date, so that TMAC would not have to take the risk of absorbing payroll costs. Simultaneously, Messrs. Goldstone and Simmons caused TMST to lose the value of the approximately $1 Million paid to Pachulski and Kirkland. Lastly, they cleverly shifted approximately $950,000 in operating costs to TMST, so that TMAC would not have to risk going out of pocket one penny. In short, Messrs. Goldstone and Simmons damaged TMST and the Debtors by no less than $5.0 Million.

**In Order to Assure that NEWCO Would Have Access to Software and Services the Defendants Viewed as Necessary to NEWCO's Success, Fraudulent Payments are Made to Vendors Shortly Before Bankruptcy**

89.     Not only did Messrs. Goldstone and Simmons loot TMST for their personal benefit and TMAC, but they also: (a) directed TMST funds to be paid to vendors they viewed as necessary for NEWCO's success without TMST or the Debtors receiving any tangible benefits

from the payments and (b) took steps to acquire the Debtors' intellectual property rights without consideration to TMST or the Debtors. In a discussion on March 30, 2009, Ms. Dempsey (who claimed in one of her four Bankruptcy Court declarations that she did not begin her representation of the "new start-up venture" until May 1, 2009) in response to Simmons' inquiry about buying intellectual property replied:

> Clay;
>
> I wouldn't go there with this broader group yet-what IP of TMA do we need to start from fresh- if we (newco) could buy Adftech out of BK estate—then get a new license from Cadence for the loan originating software-what exactly do "we" need from TMA or even TMAC at that point?
>
> And I also think we should avoid discussing Newco ideas or alternatives for TMAC with this broader group who have been engaged to represent TMA maximize the value of its assets….

90.    The vendor Ms. Dempsey referenced was Big Tree Inc. d/b/a 3t Systems ("3t"). 3t was the licensor of a loan origination software application called Mortgage Cadence, which TMHL had used for loan originations.   As part of NEWCO's contemplated technology infrastructure, Messrs. Goldstone and Simmons identified Mortgage Cadence as its loan origination system. In fact, Mortgage Cadence was specifically identified in NEWCO investor presentations as its loan origination system.   Notwithstanding the fact that TMHL had not originated any mortgage loans since June 2008 and had no present intention of starting again for the foreseeable future, Mr. Goldstone negotiated an agreement with 3t whereby TMHL agreed to pay 3t a licensing and support fee for Mortgage Cadence in the amount of $382,098.75 for the period ending October, 2009.   On March 31, 2009, knowing that a bankruptcy filing for the Debtors was imminent, TMST, with Messrs. Goldstone's and Simmons' express approval, wire transferred the $382,098.75 payment to 3t.   The Debtors received no benefit for this payment;

rather, the payment and acquisition of the extended licenses took place solely so that Mortgage Cadence would be available for NEWCO's use, at no cost to NEWCO.

91.     Another vendor Messrs. Goldstone and Simmons required for NEWCO was SS&C Technologies, Inc. ("SS&C"). SS&C was the licensor of software referred to as CAMRA and Lighting, an integrated mortgage backed security portfolio management system.  As with Mortgage Cadence, SS&C and CAMRA and Lighting were identified in NEWCO investor presentations as part of its proposed technology infrastructure. TMST had tested but never fully implemented the SS&C software, but Messrs. Goldstone and Simmons wanted it available for NEWCO.  Mr. Simmons approached SS&C about assigning the license to the yet to be formed NEWCO, but SS&C would not agree to assign the licenses to an entity that was not yet formed. Therefore, Mr. Simmons caused SS&C to be paid for April, 2009 services and negotiated a purported termination payment to SS&C totaling $606,306.00, in return for which a principal of SS&C assured Simmons that "SS&C will ensure that you are in a position to start using the same tools when your business is restarted."  On April 15, 2009 TMAC wired $31,834 for April, 2009 services and thereafter,  on April 30, 2009 (the eve of the bankruptcy filings), at Mr. Simmons' express direction, TMAC paid SS&C another $574,472.00.   On the same day, Mr. Simmons caused TMST to reimburse this payment in full by wire transfer to TMAC.  Neither TMST nor any of the Debtors obtained any benefit from this payment. Both payments were made solely so that CAMRA and Lighting would be available for NEWCO's use.

92.     Ketchum is an investor relation and marketing firm with whom Mr. Simmons and TMST had a long-standing relationship.  Messrs. Simmons and Goldstone targeted Ketchum as another critical vendor for NEWCO.  In the ordinary course, TMST paid Ketchum a quarterly retainer of $150,000.00, plus out-of-pocket expenses. For instance, on January 5, 2009, Ketchum

sent TMST an invoice for $150,000.00 for first quarter 2009 services.  The invoice had a due date of February 4, 2009, which TMST paid by check dated February 25, 2009.

93.    On March 13, 2009, Ketchum sent Mr. Goldstone an invoice for $165,000.00 purportedly for services for second quarter 2009 (April, May, June). The invoice had a due date of April 13, 2009.  While Messrs. Goldstone and Simmons knew that TMST no longer needed Ketchum's services, Mr. Simmons approved the invoice on March 15, 2009 and had TMST pay the invoice by wire transfer on March 16, 2009.

94.    In June 2009, when Protiviti (the Debtors' Bankruptcy Court approved financial advisors) began asking for back-up for this March 13 Ketchum invoice, Suzanne O'Leary Lopez, who reported to Ms. Pell and was a close confidant of Mr. Simmons, suggested to Judith Brennan of Ketchum by email (copied to Ms. Pell) that:

> Charles from Protiviti…..wants back up support for the retainer $165K from April to June, 2009….
>
> He would like to see your work product during the quarter—I am thinking our 'Z' file in IRPR has a lot of content—but the only issue I  have is that most of that was developed in March—if we could represent that March work as work that was paid for in the 2Q retainer that would be good….

95.    Despite her employee's attempt to cover-up the bona fides of the retainer by telling Ketchum to treat first quarter work as having been done in the second quarter, Ms. Pell later falsely reported to Protiviti that they had requested a return of the unused retainer. Ketchum has not returned any portion of the retainer and the Debtors received no benefit for this payment; rather the payment was made solely to insure that Ketchum's services would be available for NEWCO's use.

96.    In mid-April 2009, Messrs. Goldstone's and Simmons' self-dealing and misappropriation of the Debtors' assets also benefited Charles MacIntosh, who shortly thereafter

became one of the founders of SAF (see discussion below). Mr. MacIntosh had been hired in December 2008 as Head of Capital Markets for TMST. Mr. MacIntosh's December 19, 2008 engagement letter set his monthly salary at $22,500.00, and guaranteed "a bonus of a minimum of $270,000 payable in December 2009." Messrs. Goldstone and Simmons arranged to have TMAC pay Mr. MacIntosh the $270,000.00 bonus (plus the WARN Act payment detailed above) the day before the Petition Date and simultaneously caused TMST to reimburse TMAC by wire transfer that same day. They did this even though the bonus was not due until December 2009, and was not an Operating Expense that was reimbursable by TMST to TMAC under the management agreements.

**The Defendants Misappropriate the Debtors' Confidential Information for NEWCO's Use**

97.    Part of the Defendants' plan to form NEWCO and obtain OTS approval for an FSB owned by NEWCO was dependent on obtaining capital to fund NEWCO's operations. Messrs. Goldstone and Simmons turned to Mr. Thornburg for this funding. Mr. Thornburg entertained their proposal and, through the middle of May, 2009, was actively engaged in discussions with Goldstone concerning such an investment. In April, 2009, Ms. Pell, among others, created a written Investor Presentation for NEWCO that proposed creating an "Opportunity Fund" within NEWCO comprised of mortgage-backed securities. The sample fund shown in the presentation was comprised entirely of approximately $8.5 Million of mortgage-backed securities owned by Mr. Thornburg, which were specifically identified by bond name, CUSIP, face amount and other characteristics.

98.    The concept and substance of the Opportunity Fund was another concept misappropriated from the Debtors. In February 2009, TMST explored the creation of its own

Opportunity Fund to attract investors. Many of Mr. Thornburg's mortgage backed securities identified in TMST's Opportunity Fund found their way into the NEWCO Investor Presentation.

99.    Messrs. Goldstone and Simmons, Ms. Pell and Ms. Burns also began "creating" other materials to establish NEWCO and to attract investors, including presentations to potential investors and the OTS, proposed business plans for NEWCO and Union Bank, strategic planning material for NEWCO, and branding and pitch-pieces for NEWCO.  In order to create these materials quickly, the Defendants had the benefit of, and used without any consideration to TMST or the Debtors, among other things, (i) the approximately $2 Million of legal and financial advisory services that TMST paid while pursuing the thrift strategy, (ii) the thousands of hours spent by TMST employees in analyzing and compiling regulatory, corporate, capital and structural issues associated with the pursuit of the thrift strategy, (iii) volumes of TMST's written, proprietary and confidential material they had reviewed and worked on in the past, and (iv) the systems and processes TMST had developed.  In many instances, the materials the Defendants "created" for NEWCO (e.g. power point presentations or "decks") included the exact same materials and looked substantially similar to presentations that they had created while pursuing the thrift strategy on behalf of TMST.

100.    The Defendants misappropriated and converted the Debtors' proprietary and confidential information without Board of Directors' approval and without paying TMST or the Debtors any consideration, for their own economic benefit and self-interests. For instance, as early as April 5, 2009, after providing Mr. Goldstone with a complete inventory of all of the Debtors' software and hardware, Ms. Burns, at Mr. Goldstone's request, began assembling information on the Debtors' software, financial information and other data, so that NEWCO could utilize it.

101.    Thereafter, with the aid of Ms. Pell and Ms. Burns, Messrs. Goldstone and Simmons extracted from the Debtors' computers scores of the Debtors' financial reports, compilations, investor presentations, intellectual property and related information and documents.  This material was copied over or emailed to computers they controlled for their and NEWCO's benefit.  Certain of this information was thereafter placed on a NEWCO sharepoint secure server and other documents and information were placed on a new computer environment set up for NEWCO.

102.    Messrs. Goldstone and Simmons and Goodwin Procter referred to their NEWCO pursuit as "Project Navajo."  While the Debtors' bankruptcy planning was underway, Messrs. Goldstone and Simmons engaged the investment banking firm of Friedman, Billings and Ramsey ("FBR") to assist them in raising capital for NEWCO and the Project Navajo merger with Union Bank.  On or about April 15, 2009, Mr. Simmons sent FBR the "Thornburg Bank, FSB Confidential Business Plan and Projected Financial Statements, Dated February 9, 2009," which TMST had prepared earlier in collaboration with Goodwin Procter.  Mr. Simmons sent FBR numerous other confidential documents and information of the Debtors, including confidential information obtained concerning the TMST related Union Bank acquisition, business and proposed operational plans.

103.    Mr. Simmons misappropriated other of the Debtors' confidential information and provided it to FBR without obtaining TMST Board approval and without compensating TMST for the use and misappropriation of the information.

104.    In April 2009, Messrs. Goldstone and Simmons and Ms. Pell were actively working with Goodwin Procter on Project Navajo.  For instance, on April 24, 2009, Goodwin Procter circulated a redlined draft of "Project Navajo Preliminary Timing and Responsibilities,"

32

followed shortly thereafter by Goodwin Procter's May 2, 2009 "Outline of Proposed Recapitalization for Project Navajo." These two documents were based on Goodwin Procter's prior work product (for which TMST paid more than $1.5 Million) relating to the same bank target that TMST had identified and negotiated with during 2008 and 2009. Messrs. Goldstone and Simmons received the benefit of this TMST confidential and proprietary work product and analysis without paying for it or otherwise providing any consideration to the Debtors.

105.    Although Messrs. Goldstone and Simmons did not formally retain Goodwin Procter for NEWCO until June 24, 2009, TMST paid portions of the fees that Goodwin Procter incurred in this effort under the $650,000 retainer Mr. Goldstone approved and caused TMST to pay to Goodwin Procter during the week of March 9, 2009. There was no justification for TMST to pay a retainer of that size to Goodwin Procter at that time, in the face of TMST's and the Debtors' impending bankruptcy.

106.    In its representation of NEWCO (SAF), Goodwin Procter relied heavily upon the prior work product it produced for TMST. For instance, on May 29, 2009, Goodwin Procter sent a draft Agreement and Plan of Merger for a Union Bank acquisition by SAF that was nothing more than a redlined revision of the prior Agreement and Plan of Merger that Goodwin Proctor created for the "Project Upsilon" merger subsidiary referred to above. Similarly, in May, 2009, Goodwin Proctor provided Messrs. Goldstone and Simmons a draft confidential agreement to be sent to Mr. Collins at Union Financial Corporation in conjunction with "Project Navajo" negotiations which was nothing more than a redline of the previous version Goodwin Procter created for TMST. The only substantive change was to replace the name "Thornburg Mortgage, Inc" with SAF Financial, Inc."

**Messrs. Goldstone and Simmons and Ms. Dempsey Make Misrepresentations to TMST's Board of Directors in Order to Attempt to Obtain the Board's Blessing for NEWCO**

107.    On April 26, 2009, another special telephonic meeting of TMST's Board of Directors took place.  In attendance, among others, were Messrs. Goldstone, Simmons and Thornburg and Ms. Dempsey.  At the end of the meeting, Mr. Thornburg raised an issue not on the agenda. After referring to a memorandum concerning directors' duties, including those dealing with corporate opportunities, Mr. Thornburg stated that several officers were "looking" at forming a thrift holding company that TMAC might finance.  He then sought an opinion from outside counsel in attendance and a board resolution that TMAC was permitted to pursue this opportunity. Counsel from Venable stated that it is conventional that this type of issue be submitted for board consideration, and that the Debtors' financial advisors could advise the board if TMAC is able to pursue this opportunity.

108.    Neither Messrs. Goldstone, Simmons, Thornburg nor Ms. Dempsey advised the Board that they were not just "looking" at this opportunity, but that they were already actively pursuing this opportunity for their own benefit. Neither Mr. Goldstone nor Mr. Simmons advised the Board that they had already used TMST property, confidential information and money in furtherance of NEWCO and Project Navajo for their own self-interest.  None of them advised the Board that the recent amendment to the Amended Management Agreement was directly related to this effort.   Ms. Dempsey was silent about what she knew.   In fact, no one mentioned NEWCO or Project Navajo. In response to one board member's stated concern that management's attention and resource should not be diverted, Mr. Goldstone falsely stated that all exploration of this opportunity was being done on his own time and without the use of the Debtors' resources or proprietary information.  Mr. Goldstone also intentionally misrepresented

to the Board that while there may be some assets of the Debtors he would want, he understood that their purchase would be subject to bankruptcy court approval.

109.    Mr. Simmons also stood by silently and failed to advise the Board honestly and fully of the extent to which he and Mr. Goldstone had clandestinely pursued the thrift strategy for their own behalf.   The wantonness of his silence is underscored by the fact that two days earlier on April 24, 2009, he sent an email to Suzanne O'Leary Lopez in which he stated:

> Are you bored today with all of us out.   BTW Unions BOD approved moving forward with the reverse merger.  We are on our way.

110.    Despite being "on their way" in securing a NEWCO merger with Union Bank, their diversion, without consideration, of millions of the Debtors' dollars and their unauthorized use of substantial amounts of the Debtors' work product, Messrs. Goldstone and Simmons and Ms. Dempsey intentionally failed to advise the Board of their actions; instead, they purposefully orchestrated a deceptive board meeting where they caused the Board to engage in a discussion over something the Defendants claimed they were "just looking at."

111.    At the same Board of Directors' meeting, counsel from Venable advised, *inter alia*, that (i) there is an exception to the corporate opportunity prohibition that would allow officers to pursue the opportunity if the corporation is unable to pursue it and (ii) proprietary information, confidential information, processes and similar assets cannot be used and remain property of the Debtors.   Counsel from Venable also stated that there were bankruptcy law considerations that overlay the corporate opportunity doctrine and that, in asset purchase transactions under bankruptcy, it would be beneficial to disclose the entire deal to the bankruptcy court.

112.    While several Board members agreed that the Debtors were no longer able to pursue the thrift strategy, the entire Board would not provide their authority or pass a resolution that TMAC or Mr. Goldstone was permitted to pursue the thrift opportunity.  It was agreed that Venable and Protiviti (the financial advisor the Board retained at the meeting) would review the matter and the Board would take the issue up again at their next scheduled board meeting on April 28, 2009.

113.    Approximately one hour after the Board meeting concluded, Mr. Goldstone contacted Charles Goldstein of Protiviti by email and advised him that the Board had discussed "future business opportunities (namely the creation of a savings and loan) being pursued by "certain officers" … that created an "issue I believe needs to be clarified and approved by the board…"  Mr. Goldstone then falsely advised Mr. Goldstein that "we are not using Company assets to pursue this new strategy."

114.    By April 28, 2009, Mr. Goldstone had changed his strategy and decided that he would not seek further Board consideration of the corporate opportunity issue.  The agenda for the April 28, 2009 Board meeting prepared by Mr. Goldstone contained no mention of this issue. In attendance, among others, at the telephonic Board meeting on April 28, 2009, were Messrs. Goldstone, Simmons and Thornburg and Ms. Dempsey who made no mention of the corporate opportunity issue.

115.    Messrs. Goldstone and Simmons did not seek (or obtain) authority from the Board to pursue the thrift opportunity that they had developed through the use of TMST's property, or to use the confidential information they had obtained in their positions as senior officers. Messrs. Goldstone and Simmons did not provide Protiviti with full disclosure respecting the extent of their NEWCO efforts or their use of the Debtors' assets.

116.    Two days later, at the request of Mr. Simmons, an employee at TMST filed a form Certificate of Incorporation in Delaware for an entity called SAF Corporation. Thereafter, Orrick prepared an Amended and Restated Certificate of Incorporation of SAF Corporation, which Mr. Goldstone signed as President and Chief Executive Officer, which was filed in Delaware on May 8, 2009. The Amended and Restated Certificate of Incorporation changed NEWCO's name to SAF Financial, Inc.  ("SAF").

117.    SAF is the alter ego of Messrs. Goldstone and Simmons; it was the name chosen for "Goldstone/Simmons NEWCO" and the vehicle through which they intended to pursue the NEWCO thrift strategy.

118.    Over the course of the next month, Orrick provided further legal services to SAF and the other Defendants without disclosing its representation to the Debtors, the Bankruptcy Court or Creditors.  Included in the services Orrick provided was the preparation of Common Stock Purchase Agreements whereby SAF founders' stock was issued to Messrs. Macintosh, Goldstone and Simmons, Ms. Pell and Ms. Burns.  At Ms. Pell's request, Orrick prepared a form Nondisclosure Agreement that was thereafter provided to potential investors in SAF.

119.    The Defendants even misappropriated the name "SAF Financial" from the Debtors.   For months while pursuing the thrift strategy, TMST's marketing department conducted brand and market research to determine a name for the proposed FSB.  Based on the research that the marketing department compiled, it was determined that SAF was one of several names that had the highest potential for successful brand awareness.

120.    On May 1, 2009 (the Petition Date), and notwithstanding that he had decided two days earlier not to seek Board approval for pursuit of the thrift strategy, Mr. Goldstone attempted to manipulate the minutes of the April 26, 2009 Board of Directors meeting to reflect what he

believed would insulate the Defendants' pursuit of their strategy.  Mr. Goldstone sent an email

that day to Ms. Dempsey that read:

> I was speaking with Paul Fish yesterday about this "corporate opportunities" issue
> with TMA and the thrift idea.  He suggested that I get the board to vote to agree
> that a thrift was not an opportunity for TMA so that the D's and O's that want to
> pursue it don't run into an issue with TMA.  I told Paul that the board already said
> they would not pass such a resolution because they felt that the opportunity was
> already documented as not viable for TMA.  Can we have the minutes from the
> April 26 board meeting reflect the discussion and conversation that it was not an
> opportunity?  No board is required so long as the minutes reflect the conversation
> that the board did not need to pass a resolution because it was their view that this is
> not a viable option for TMA given its financial condition.

121.    Ms. Dempsey replied:

> Yes-those minutes will reflect that discussion. Venable believes cleaner next step
> is for mgmt to do a 363 purchase of any assets or IP from TMA or TMHL if mgmt
> believes it wants those assets.

122.    Ms. Dempsey, who was the Assistant Secretary of TMST, did not immediately

draft the minutes of the April 26, 2009 Board of Directors meeting.  However, on May 11, 2009,

Ms. Dempsey, on behalf of Orrick, and Mr. Simmons, on behalf of SAF, executed a letter

agreement pursuant to which Orrick was engaged to provide SAF legal representation.  Ms.

Dempsey did not advise the Debtors about her representation of SAF or that that her SAF

representation created or could create conflicts of interest with her simultaneous representation

of the Debtors.  Ms. Dempsey did not request a waiver from the Debtors of any potential or

actual conflict, nor did she advise the Debtors that this dual representation may not be legally

permissible under the Bankruptcy Code.  Ms. Dempsey did not file a supplemental declaration

with the Bankruptcy Court overseeing the Debtors' cases until the Debtors discovered her

simultaneous representation of SAF in August, 2009.  Only after Ms. Dempsey's secret was

discovered did she finally disclose her dual representation to the Bankruptcy Court by way of a Supplemental Declaration filed on August 28, 2009.

123.    On June 14, 2009, Ms. Dempsey finally circulated draft minutes of the April 26, 2009 Board of Directors meeting.  Emblematic of the fact that her personal loyalty ran to Messrs. Goldstone and Simmons and SAF, and without regard to the fact that her ethical duty and duty of loyalty ran to her long standing client TMST and the other Debtors, Ms. Dempsey's draft of the minutes followed Mr. Goldstone's May 1, 2009 proposed format and intentionally misstated the opinion that Jim Hanks, Esq. of Venable presented to the board at the meeting.  In her draft Ms. Dempsey wrote:

> Jim Hanks responded to such questions, noting that even if a corporate opportunity existed with regard to portions of the original thrift application, business plan or acquisition of a specified bank, an exception to the doctrine exists because the Company is not currently in a position to undertake such opportunity either financially or otherwise pursue it on its own.  As a result, if TMAC or members of management were to pursue a thrift opportunity or acquisition of a bank at this time on their own, such actions would not constitute usurping a corporate opportunity belonging to the Company.  Mr. Hanks advised that management should obtain advice from Protiviti should they learn that there are any assets of the Company today or of the bankruptcy estate in the future that would be needed to implement their newco  thrift strategy.  He also noted that employees are generally not held accountable for gaining "knowledge" in a job which would prohibit them from applying such knowledge in a future new business opportunity.   He noted however that should be contrasted with proprietary information of the Company which would be assets of the Company that must remain with the Company.

124.    Ms. Dempsey's draft attempted to reflect that Mr. Hanks had considered the facts she and the Defendants concealed and then provided an "opinion" that TMAC and Messrs. Goldstone and Simmons were now free "at this time on their own" to pursue the thrift strategy.

125.    Within two days, Mr. Hanks sent his comments to this draft to Ms. Dempsey.  Mr. Hanks struck out substantially all of Ms. Dempsey's language and replaced it with the following:

Jim Hanks advised that, even if a corporate opportunity existed with respect to a business strategy to acquire a depository thrift institution or other banking institution, directors and officers should not be liable to the Company for pursuing such for themselves if the Company is not able to undertake or pursue the strategy on its own. Mr. Hanks also noted that employees are not prohibited from applying knowledge gained during the course of their employment in a future business opportunity, but that proprietary information of the Company is an asset of the Company that must remain with the Company.

126. TMST's minutes of the April 26, 2009 approved by the Board of Directors contained the revised language proposed by Mr. Hanks. Thereafter, during the month of June 2009, Ms. Dempsey signed the minutes as Assistant Secretary and acted in that capacity even though she had purportedly been relieved of that office months earlier.

127. Messrs. Goldstone and Simmons did not obtain approval of, or a resolution from, the TMST Board of Directors authorizing them or SAF (i) to pursue the thrift strategy previously developed by TMST, (ii) to use TMST's or THML's assets, personnel or funds in pursuit of the thrift strategy, (iii) to use the information they had obtained in their position as senior officers, or (iv) to retain and use Orrick for legal representation.

128. Had the independent directors of TMST been apprised of the true facts surrounding Defendants' activities in pursuing NEWCO (and eventually operating SAF), Defendants' use of TMST's and TMHL's tangible and intangible assets and their misappropriation of TMST's thrift work product, one or more Board members would have taken steps to prevent the scheme Messrs. Goldstone and Simmons perpetrated with the remaining Defendants and the resulting damage to the Debtors.

**After the Debtor's Bankruptcy Cases Are Filed the Defendants Begin Having the Debtors Absorb the Payroll Costs of Employees Providing Services to SAF and Misappropriate Other Resources of the Debtors**

129.    By the end of April 2009, TMAC terminated all or substantially all of its employees. Under the plan Messrs. Goldstone and Thornburg put in place, Mr. Goldstone advised the Board that TMST and TMHL would hire back employees (including Messrs. Goldstone and Simmons) on a part-time, hourly basis as needed for the orderly wind down of the Debtors. However, Messrs. Goldstone and Simmons also needed employees to implement and staff SAF. Therefore, without advising the Board, Messrs. Goldstone and Simmons and Ms. Burns and Ms. Pell determined which employees to hire back to serve SAF's needs.   For instance, by an email dated April 28, 2009, addressed to Ms. Pell, Ms. Burns, Mr. Macintosh and Michael Coltharp (TMST's controller at that time), Mr. Simmons, under the subject line of "Staffing", directed them as follows:

> I need your guys put in 4 buckets
>
> NEWCO only
> TMA wind down only
> Some of both
> And don't need

130.    At the same time, Ms. Burns and the human resources department exchanged emails concerning the new payroll setups they would soon be implementing for "Thornburg Mortgage, Inc. and SAF Corp."

131.    On April 29, 2009, Mr. Goldstone called employees, by groups, into a series of meetings in TMST's conference room. The groups consisted of those employees (i) who were being terminated, (ii) who had been selected to work only on the Debtors' bankruptcy related matters (called "One-Hatters") and (iii) who were selected to work on both the Debtors' bankruptcy related matters and SAF matters (called "Two-Hatters").   In addition there were certain employees selected to fill the fourth "bucket" to work only on SAF matters.

132.    As of the Petition Date, there were approximately 27 employees designated as One-Hatters, 14 designated as Two-Hatters and 4 designated as SAF only employees.   Over time, as Messrs. Goldstone's and Simmons' funding for SAF dried up, they started shifting employees designated as Two-Hatters and SAF only to the One-Hatters bankruptcy designation so they would be paid by TMST, even though they were providing services for SAF.

133.    Over the course of the next few days, the One-Hatters and Two-Hatters were given new instructions by Ms. Pell and others as to how to record their time so they could be paid by either TMST or SAF for the time they worked. Under the initial policy established by Messrs Goldstone, Simmons and Ms. Pell, beginning on May 1, 2009, employees were to record their time spent on the Debtors' or SAF's matters separately and then they were to be paid either by the Debtors or SAF as their hours dictated.

134.    SAF was undercapitalized at its inception. At one point, Mr. Goldstone estimated it would take approximately $1.5 Million to get SAF through to OTS approval, which Messrs. Goldstone and Simmons did not or could not personally provide.   Mr. Goldstone assumed he would get his initial "seed money" from Mr. Thornburg.   On May 1, 2009, Mr. Goldstone asked Ms. Dempsey to help him prepare a term sheet he could present to Mr. Thornburg to obtain that seed money. The term sheet they provided to Mr. Thornburg contemplated, among other things, that Mr. Thornburg or TMAC would invest up to $2 Million in SAF, consisting of an initial draw of $1 Million, with additional optional draws of up to $1 Million. At the time Messrs. Goldstone, Simmons and Ms. Pell established their initial payroll policy they were dependent upon and believed that Mr. Thornburg would provide this funding to SAF.

135.    Over the next two week period, Messrs. Goldstone and Thornburg attempted to negotiate the terms under which Mr. Thornburg or TMAC would invest in SAF.   At the same

time, Ms. Dempsey and Mr. Goldstone had ongoing discussions about the terms of Mr. Thornburg's investment and Ms. Dempsey prepared revised term sheets reflecting those discussions.

136.    However, on or about May 13, 2009, Mr. Thornburg advised Mr. Goldstone that he would not invest in SAF.  Thereafter, Mr. Goldstone requested that Mr. Thornburg provide him a $1 Million advance as a partial payout of Mr. Goldstone's equity interest in TMAC.  Mr. Thornburg declined that request, but thereafter agreed to have TMAC lend Mr. Goldstone $500,000.  To secure that $500,000 loan, Mr. Goldstone was required to pledge his 12,650 shares of Class B non-voting common stock in TMAC.

137.    Faced with a sudden inability to obtain their anticipated seed money, Messrs. Goldstone and Simmons and Ms. Pell immediately began manipulating the payroll policy so that the Debtors began paying for an increasingly larger portion of employees' time dedicated to SAF related functions.  Moreover, they modified the payroll policy so that people they believed necessary for operating SAF were paid by the Debtors, even though they may not have provided any material services to the Debtors. To implement this "new" payroll policy, on May 18, 2009, Ms. Pell sent around an email (which she first vetted with Messrs. Goldstone and Simmons and Ms. Burns) to all employees setting forth their revised time keeping policy.  In her email, Ms. Pell advises One-Hatters:

> Log all hours worked and available for work (in the building) on BK into the appropriate buckets in actiTIME.  If you were out of the office log those hours into the G&A bucket in actiTIME.  Your hours should add up to at least 40 per week.  If you worked over 40 hours on the bankruptcy, log those into actiTIME as well.  You will be paid for only 40 hours with the remaining hours being carried over to the next time period where you did not work a 40 hour week.  All excess hours remaining at the end of your employment on the BK will be paid at that time.

At the same time log any hours worked on NewCo in to the NewCo actiTIME system for management tracking purposes only. We would like to know how many hours each of you are spending on NewCO despite the fact that you are being paid your full compensation by TMA for bankruptcy work you are doing.

138.    In her May 18, 2009 Email, Ms. Pell goes on to advise Two-Hatters:

Log all hours worked and available for work (in the building) on BK in the appropriate buckets in the BK actiTIME system.  If you were out of the office log those hours into the G&A bucket in the BK actiTIME system.  Log only actual hours worked on NewCo into the NewCo actiTIME system.  In total, the two systems should add up to at least 40 hours.  You will be paid for only 40 hours in total.  If you worked over 40 hours on BK the excess hours over 40 will be carried over to the next time period.  All excess hours remaining at the end of your employment on the BK will be paid at that time.  There will be no carry over for any NewCo hours worked in excess of 40 hour week (BK and NewCo combined).

139.    In summary, this new policy provided that SAF pay only actual time a Two-Hatter recorded as SAF time, with the balance (of up to a guaranteed 40 hours a week) paid by the Debtors, even if that person did not provide services to the Debtors and was only "available for work."  Messrs. Goldstone and Simmons and Ms. Pell thereby improperly saddled the Debtors with payroll expenses for employees they viewed as important to SAF's success and who were not required to, or did not, provide any benefit to the Debtors.

140.    Because representatives of the Official Committee of Unsecured Creditors were scheduled to visit the Debtors' office the next day, on May 18, 2009, Ms. Pell also sent an email to all employees reminding them:

Please refrain from having open conversations regarding any new venture you may be working on. Remember the walls are paper thin and these people will be looking to get value out of every paper clip.  Let's not give them the opportunity to look anywhere besides Thornburg Mortgage.  Thanks.

141.    In furtherance of their scheme to lessen SAF's payroll costs to the detriment of the Debtors, Ms. Pell also directed that employees be shifted from a Two-Hatter to a One-Hatter

designation, even if they were actually providing services to SAF. For instance, on June 3, 2009,

Ms. Pell sent an email to Ms. Burns and the human resources department stating:

> …we are moving a group of people from 2 hat to 1 BK hat…
>
> Reiterating the rules:
> 1 hat BK people
> Will be paid for all hours in the building (non G&A) up to 40 per week. All excess hours will be banked. BK actiTIME should reflect at least 40 hours per week. They will not be paid any hours for SAF work although they may continue to report any hours worked
>
> 2 hat people
> Will continue to be paid by both companies. If worked over 40 hours BK, bank those hours and use them the next weeks in place of any G&A hours and SAF hours. Should be paid for all actual SAF hours worked up to 40 per week (minus any BK banked hours used) with the remaining paid from TMA.
>
> Clear as mud. I'm meeting with some groups today to explain the process and again to avoid confusion.

142.    Ms. Pell did in fact meet with employees and advised them to begin recording time as "BK" only, which in essence led to sham time records in keeping with the Defendant's new policy.

143.    Beginning no later than March 31, 2009 and through September 2009, various employees worked on matters for the sole benefit of NEWCO/SAF, at the expense of the Debtors. Among other things, these employees worked on and prepared NEWCO/SAF business plans, investor presentations, OTS presentations and financial pro formas.

144.    By virtue of this scheme whereby the Debtors absorbed SAF's payroll costs, the Debtors paid approximately $400,000 in non-executive payroll costs for employees who performed services for SAF, and for which the Debtors received no benefit.

145.    Messrs. Goldstone and Simmons, Ms. Burns and Ms. Pell were also the direct beneficiaries of funds they similarly converted from the Debtors. Despite spending substantial

time working on SAF matters, between the Petition Date and September 15, 2009, Messrs.

Goldstone and Simmons and Ms. Burns received no salary from SAF.  However, the Debtors

paid Mr. Goldstone $316,514, Mr. Simmons $223,248 and Ms. Burns $78,015.  During that

same period, the Debtors paid Ms. Pell $44,284, while she only received $18,536 from SAF.

Similarly, during that same period, the Debtors paid Mr. MacIntosh $73,554 and only $22,907

from SAF.  Including their illegal bonuses, WARN Act payments and salaries, between April

2009 and September 15, 2009, Messrs. Goldstone, Simmons and MacIntosh and Ms. Burns and

Ms. Pell received from or caused the Debtors to pay themselves approximately $1.7 Million.

146.    Attempting to justify post-petition salaries to himself and Mr. Goldstone, Mr.

Simmons on July 17, 2009 signed, under oath, the Debtors' Statement Pursuant To Local

Bankruptcy Rule 2015-1(b), certifying that the rate of pay for the ninety (90) days prior to the

Petition Date for himself and Mr. Goldstone was $85,493.34 and $60,978.33 respectively. At

best, this certification was misleading because their actual salary payments were substantially

less.  In order to create this inflated amount, Mr. Simmons included in his calculation the

"secret" $140,000 bonus to Mr. Goldstone and $92,000 bonus to himself that they had previously

misappropriated from TMST.

147.    Messrs. Goldstone and Simmons and Ms. Pell also made blatantly false and

inaccurate time entries into the actiTIME payroll system to support their salaries from the

Debtors.  For instance, on June 2 and 3,  2009, while Mr. Goldstone and he were out of the office

attending a branding workshop for SAF, Mr. Simmons's actiTIME entries reflect 8 hours each

day for time devoted to bankruptcy issues. Similarly, Ms. Burns, who also attended the workshop

with Mr. Simmons, recorded 6 and 8 hours respectively for the two day period.

148.    After the Petition Date and through approximately September 11, 2009, Messrs. Goldstone and Simmons used the Debtors' offices, fixed assets, computers and other personal property, without fair consideration.  The estimated fair value for the foregoing use of space and assets is approximately $170,000.00.

149.    On or about August 27, 2009, counsel for the Official Committee of Unsecured Creditors received an anonymous letter, dated August 25, 2009 (the "Whistleblower Letter"), concerning Goldstone's and Simmons' misappropriation of the Debtors' payroll.    The Whistleblower Letter was thereafter provided to the Debtors and the UST.

150.    As a result of their review of the Whistleblower Letter and other information provided to them, TMST's Independent Directors directed Venable to conduct an independent investigation of the circumstances surrounding the allegations contained in the Whistleblower Letter.

151.    Shortly thereafter, the UST filed a motion seeking the appointment of a trustee or an examiner.   After intensive discovery and a multi-day trial, on October, 23, 2009 the Bankruptcy Court directed the UST to appoint a Chapter 11 trustee.

152.    As a direct and proximate result of the Defendants' conduct to date, the Debtors have incurred legal and professional expenses and costs in the approximate amount of $1.3 Million related to the independent investigation and the UST motion.

**Count I – Avoidance of Fraudulent Transfers**
**(11 U.S.C. §§ 548 and 550)**
**Goldstone, Simmons, Burns and Pell**

153.    The Trustee hereby incorporates the allegations set forth in Paragraphs 1 through 152 above, as if more fully set forth in this Count.

154.    The unauthorized bonus payments made on or about April 3, 2009 to Mr. Goldstone in the amount of $140,000, Mr. Simmons in the amount of $92,000, Ms. Burns in the amount of $53,000 and Ms. Pell in the amount of $40,000, and the subsequent reimbursement on or about April 15, 2009 by TMST to TMAC for these transfers (hereinafter collectively referred to as the "Unauthorized Payments") constitute transfers of an interest in property of the Debtors.

155.    The Unauthorized Payments were made within two (2) years of the Petition Date.

156.    TMST received less than a reasonably equivalent value for the Unauthorized Payments.

157.    TMST, under the control of Messrs. Goldstone and Simmons, made the Unauthorized Payments with the actual intent to hinder, delay or defraud its creditors.

158.    At the time TMST made the Unauthorized Payments, TMST was engaged in business for which the property remaining with TMST was an unreasonably small capital; TMST intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay such debts as they matured.

159.    The Unauthorized Payments were made to or for the respective benefit of Mr. Goldstone, Mr. Simmons, Ms. Pell and Ms. Burns.

160.    The Unauthorized Payments are avoidable and recoverable pursuant to §§ 548 and 550 of the Bankruptcy Code.

**WHEREFORE**, for the foregoing reasons, the Plaintiff Joel I. Sher, Chapter 11 Trustee respectfully requests the following relief:

A.      That the Unauthorized Payments be avoided;

B.      That judgment be entered in favor of the Trustee and against Mr. Goldstone, in the amount of $140,000 plus interest at the legal rate, together with any costs of this action;

C.      That judgment be entered in favor of the Trustee and against Mr. Simmons in the amount of $92,000 plus interest at the legal rate, together with any costs of this action;

D.      That judgment be entered in favor of the Trustee and against Ms. Burns, in the amount of $53,000 plus interest at the legal rate, together with any costs of this action;

E.      That judgment be entered in favor of the Trustee and against Ms. Pell, in the amount of $40,000 plus interest at the legal rate, together with any costs of this action;

F.      That the Plaintiff be granted such other and further relief as is just and equitable.

### Count II – Avoidance of Fraudulent Transfers
### (11 U.S.C. §§ 544 and 550 and Applicable State Law)
### Goldstone, Simmons, Burns and Pell

161.    The Trustee hereby incorporates the allegations set forth in Paragraphs 1 through 152 above, as if more fully set forth in this Count.

162.    The Unauthorized Payments constitute transfers of an interest in property of TMST, which are avoidable under applicable law by a creditor holding an unsecured claim that is allowable against TMST under Section 502 of the Bankruptcy Code.

163.    A creditor exists that could avoid the Unauthorized Payments under applicable non-bankruptcy law.

49

164.     TMST, under the control of Messrs. Goldstone and Simmons, made the Unauthorized Payments with the actual intent to hinder, delay or defraud creditors of the Debtors.

165.     TMST made the Unauthorized Payments without receiving reasonably equivalent value or fair consideration therefor.

166.     At the time TMST made the Unauthorized Payments, TMST was engaged in business, for which the property or assets remaining with TMST was an unreasonably small capital; TMST intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay such debts as they matured.

167.     TMST was insolvent, as that term is defined by applicable law when TMST, under the control of Messrs. Goldstone and Simmons, made Unauthorized Payments.

168.     The Unauthorized Payments are avoidable and recoverable pursuant to §§ 544 and 550 of the Bankruptcy Code.

**WHEREFORE**, for the foregoing reasons, the Plaintiff Joel I. Sher, Chapter 11 Trustee respectfully requests the following relief:

A.     That the Unauthorized Payments be avoided;

B.     That judgment be entered in favor of the Trustee and against Mr. Goldstone, in the amount of $140,000 plus interest at the legal rate, together with any costs of this action;

C.     That judgment be entered in favor of the Trustee and against Mr. Simmons in the amount of $92,000 plus interest at the legal rate, together with any costs of this action;

D.     That judgment be entered in favor of the Trustee and against Ms. Burns, in the amount of $53,000 plus interest at the legal rate, together with any costs of this action;

E.     That judgment be entered in favor of the Trustee and against Ms. Pell, in the

amount of $40,000 plus interest at the legal rate, together with any costs of this action;

F.      That the Plaintiff be granted such other and further relief as is just and equitable.

### Count III – Avoidance of Fraudulent Transfers
### (11 U.S.C. §§ 548 and 550)
### Goldstone, Simmons and SAF

169.    The Trustee hereby incorporates the allegations set forth in Paragraphs 1 through 152 above, as if more fully set forth in this Count.

170.    The payments to (i) Big Tree Inc. d/b/a 3t Systems in the amount of $382,098, (ii) SS&C in the amount of $606,306 and (iii) Ketchum in the amount of $165,000, as well as TMST's reimbursement of TMAC for its payment to SS&C (collectively hereinafter referred to as the "Vendor Payments") constitute transfers of an interest in property of TMST.

171.    The Vendor Payments were made within two (2) years of the Petition Date.

172.    TMST received less than a reasonably equivalent value for the Vendor Payments.

173.    TMST under the control of Messrs. Goldstone and Simmons made the Vendor Payments with the actual intent to hinder, delay, or defraud its creditors.

174.    At the time TMST made the Vendor Payments, TMST was engaged in business, for which the property remaining with TMST was an unreasonably small capital; TMST intended to incur, or believed or reasonably should have believed that TMST would incur, debts beyond its ability to pay such debts as they matured.

175.    The Vendor Payments were made to or for the respective benefit of Messrs. Goldstone, Simmons and SAF.

176.    The Vendor Payments are avoidable and recoverable pursuant to §§ 548 and 550 of the Bankruptcy Code.

**WHEREFORE**, for the foregoing reasons, the Plaintiff Joel I. Sher, Chapter 11 Trustee

respectfully requests the following relief:

A.     That the Vendor Payments be avoided;

B.     That judgment be entered in favor of the Trustee and against Messrs. Goldstone, Simmons and SAF, jointly and severally, in the amount of $1,153,404 plus interest at the legal rate, together with any costs of this action; and

C.     That the Plaintiff be granted such other and further relief as is just and equitable.

### Count IV – Avoidance of Fraudulent Transfers
### (11 U.S.C. §§ 544 and 550 and Applicable State Law)
### <u>Goldstone, Simmons and SAF</u>

177.   The Trustee hereby incorporates the allegations set forth in Paragraphs 1 through 152 above, as if more fully set forth in this Count.

178.   The Vendor Payments constitute transfers of an interest in property of the Debtors, which are avoidable under applicable law by a creditor holding an unsecured claim that is allowable against TMST under Section 502 of the Bankruptcy Code.

179.   A creditor exists that could avoid the Vendor Payments under applicable non-bankruptcy law.

180.   The Debtor, under the control of Messrs. Goldstone and Simmons, made the Vendor Payments with the actual intent to hinder, delay or defraud creditors of the Debtors.

181.   TMST made the Vendor Payments without receiving reasonably equivalent value or fair consideration therefor.

182.   At the time TMST made the Vendor Payments, TMST was engaged in business, for which the property remaining with TMST was an unreasonably small capital; TMST intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay such debts as they matured.

183.    TMST was insolvent, as that term is defined by applicable law when the Debtor, under the control of Messrs. Goldstone and Simmons made Vendor Payments.

184.    The Vendor Payments are avoidable and recoverable pursuant to §§ 544 and 550 of the Bankruptcy Code.

**WHEREFORE**, for the foregoing reasons, the Plaintiff Joel I. Sher, Chapter 11 Trustee respectfully requests the following relief:

A.    That the Vendor Payments be avoided;

B.    That judgment be entered in favor of the Trustee and against Messrs. Goldstone, Simmons and SAF, jointly and severally, in the amount of $1,153,404 plus interest at the legal rate, together with any costs of this action; and

C.    That the Plaintiff be granted such other and further relief as is just and equitable.

### COUNT V- Turnover of Property of the Estate
### (11 U.S.C. § 542)
### Goldstone, Simmons and SAF

185.    The Trustee hereby incorporates the allegations set forth in Paragraphs 1 through 152 above, as if more fully set forth in this Count.

186.    The various books, compilations, financial and accounting records, decks, and other tangible and intangible property of the Debtors that were transferred to the possession and control of SAF, Goldstone and Simmons constitute property of the estate within the meaning of 11 U.S.C. § 541.

187.    SAF, Goldstone and Simmons have failed to deliver and account to the Trustee for all of the Debtors' property that they removed or directed to be removed  from the Debtors to the possession and control of themselves and SAF.

188.    The Debtors' property that Goldstone and Simmons removed or directed to be removed from the Debtors to the possession and control of themselves and SAF may be used, sold or leased by the Trustee.

189.    Cause exists for passage of an order directing SAF, Goldstone and Simmons to account to the Trustee for all such property or the value of such property.

**WHEREFORE**, for the foregoing reasons, the Plaintiff Joel I. Sher, Chapter 11 Trustee respectfully requests the following relief:

A.      That SAF, Goldstone and Simmons account to the Trustee for all of the Debtors' property that they removed or directed to be removed to their possession and control;

B.      That SAF, Goldstone and Simmons be directed to turnover to the Trustee all of the Debtors' property or the value of such property that said Defendants removed or directed to be removed to their possession and control;

C.      That judgment in favor of the Plaintiff and against SAF, Goldstone and Simmons be granted in an amount equal to the value of the Debtors' property that said Defendants removed or directed to be removed into their possession and control; and

D.      That the Plaintiff be granted such other and further relief as is just and equitable.

### COUNT VI- Post-Petition Transfers
### (11 U.S.C. §§ 549 and 550)
### Goldstone, Simmons and SAF

190.    The Trustee hereby incorporates the allegations set forth in Paragraphs 1 through 152 above, as if more fully set forth in this Count.

191.    After the Petition Date, TMST absorbed and paid for approximately $400,000 in non-executive SAF payroll costs for which TMST received no benefit.

192.    Neither Goldstone, Simmons nor SAF sought or obtained an order of the Court authorizing TMST to pay these SAF payroll costs.

193.    TMST's payment of SAF payroll costs were not authorized under the Bankruptcy Code or by the Bankruptcy Court.

194.    TMST's payment of these SAF payrolls costs was made for the benefit of Goldstone, Simmons and their alter ego SAF.

**WHEREFORE**, for the foregoing reasons, the Plaintiff Joel I. Sher, Chapter 11 Trustee respectfully requests the following relief:

A.    That judgment be entered in favor of the Plaintiff and against Goldstone, Simmons and SAF, jointly and severally, in the amount not less than $400,000,  plus interest at the legal rate, together with any costs of this action; and

B.    That the Plaintiff be granted such other and further relief as is just and equitable .

### COUNT VII- Breach of Contract
### Goldstone, Simmons, Burns and Pell

195.    The Trustee hereby incorporates the allegations set forth in Paragraphs 1 through 152 above, as if more fully set forth in this Count.

196.    On or about July 22, 2003, TMST implemented a Code of Business Conduct and Ethics ("Code of Conduct").  Mr. Goldstone, Mr. Simmons, Ms. Burns and Ms. Pell each executed Employee Acknowledgement Forms pursuant to which they agreed, *inter alia*, to comply with the Code of Conduct.

197.    The Code of Conduct provides that:

Employees, officers and directors are prohibited from taking for themselves personally opportunities that are discovered through the use of corporate property, information or position without the consent of the Board of Directors.   No employee, officer or director may use corporate property, information or position

55

for personal gain, and no such person may compete with the Company directly or indirectly. Employees, officers and directors owe a duty to the Company to advance its legitimate interests when the opportunity to do so arises.

198. This provision of the Code of Conduct controlled the employer-employee relationship between TMST and MR. Goldstone, Mr. Simmons, Ms. Burns and Ms. Pell respectively, and gave rise to reasonable expectations of their conduct.

199. The Code of Conduct created an implied contract between TMST and Mr. Goldstone, Mr. Simmons, Ms. Burns and Ms. Pell.

200. Mr. Goldstone, Mr. Simmons, Ms. Burns and Ms. Pell materially breached this implied contract by failing to obtain the consent of the Board of Directors to, among other things:

A. Pursue on their own behalf for personal gain the thrift opportunity that they had discovered and developed through the use of TMST's employee, monies and other property and during periods when they were respectively directors, officers and/or employees of TMST and TMHL;

B. Use the work product that TMST had created with the assistance of Goodwin Procter, Deloitte and TMST's employees, at the Debtors' expense, to pursue on their own behalf for personal gain the thrift opportunity and the merger with Union Bank; and

C. Use the Debtors' employees, offices, hardware, software, intellectual property, monies and other assets to pursue on the thrift opportunity for their own personal gain.

201. Mr. Goldstone, Mr. Simmons, Ms. Burns and Ms. Pell materially breached this implied contract by failing to advance TMST's legitimate interests in maximizing the value of its hardware, software, intellectual property and other assets by a disposition of them at fair value to SAF or some other third party buyer.

**WHEREFORE**, for the foregoing reasons, the Plaintiff Joel I. Sher, Chapter 11 Trustee respectfully requests the following relief:

A.      That judgment be entered in favor of the Trustee and against Mr. Goldstone, Mr. Simmons, Ms. Burns and Ms. Pell for consequential damages arising from their breach of contract, in amount not less than $6,700,00 to be proven at trial; and

B.      That the Trustee be granted such other and further relief as is just and equitable.

## COUNT VIII- Breach of Contract
## Goldstone and Simmons

202.    The Trustee hereby incorporates the allegations set forth in Paragraphs 1 through 152 and 196 through 198 above, as if more fully set forth in this Count.

203.    Messrs. Goldstone and Simmons materially breached the implied contract arising under the Code of Conduct by failing to obtain the consent of the Board of Directors to use corporate funds to make the Vendor Payments for their personal gain and benefit.

**WHEREFORE**, for the foregoing reasons, the Plaintiff Joel I. Sher, Chapter 11 Trustee respectfully requests the following relief:

A.      That judgment be entered in favor of the Trustee and against Mr. Goldstone and Mr. Simmons, jointly and severally, for consequential damages arising from their breach of contract, in amount not less than $1,153,404, to be proven at trial; and

B.      That the Trustee be granted such other and further relief as is just and equitable

## COUNT IX- Breach of Contract
## Goldstone, Simmons, Burns and Pell

204.    The Trustee hereby incorporates the allegations set forth in Paragraphs 1 through 152 above, as if more fully set forth in this Count.

205.    Mr. Goldstone, Mr. Simmons, Ms. Burns and Ms. Pell each executed and delivered an Employee Confidentiality Agreement to TMAC (the "Confidentiality Agreement").

206.     The Confidentiality Agreement was intended for the benefit of TMST and TMHL, and they were intended third-party beneficiaries of the Confidentiality Agreement.

207.     The Confidentiality Agreement provides, among other things:

The Employee shall at all times during and after the terms of employment with the Company hold in the strictest confidence, any non-public information or materials of any type relating to the Company or its clients, including, but not limited to, trade secrets or confidential information relating to products, processes, know-how, business plans, methods, financial information, technical information, marketing plans, systems, computer software or programs data bases, customer lists, forecasts, strategies, projects, proposals of other subject matter pertaining to any business of the Company or any of its clients, consultants or partners (the "Confidential Information").

The Employee agrees that, during the terms of employment with the Company, he or she shall not make, use or permit to be used, any documentation or information or materials relating to the Confidential Information discussed above, or any matter within the scope of the business of the Company.  It is agree that all of the foregoing shall be and remain the sole and exclusive property of the Company and that immediately upon the termination of the Employee's employment with the Company or upon the Company's earlier request, he or she will return all of the foregoing, and all copies thereof, to the Company.

208.     Mr. Goldstone, Mr. Simmons, Ms. Burns and Ms. Pell materially breached the Confidentiality Agreement by, among other things:

A.     Assembling and providing FBR Confidential Information;

B.     Working with Goodwin Procter to prepare agreements, memoranda, plans and other documents for SAF based upon TMST's prior proposals,  business plans, financial information and similar work product and thereafter disseminating that information and documents to third parties;

C.     Creating SAF investor and OTS presentations, as well as SAF branding and marketing material based upon and using business plans, financial information, forecasts and strategies TMST developed;

D.     Creating  SAF business plans, models and forecasts using business plans, financial information, forecasts and strategies developed by TMST;

E.     Using marketing and branding studies and compilations to develop the name for SAF;

F.    Transferring the Debtors' Confidential Information to computers maintained by SAF and thereafter using the Confidential Information for SAF's benefit and business purposes; and

G.    Using the Debtors' employees, offices, hardware, software, intellectual property, monies and other assets to pursue the thrift opportunity for their own personal gain;

209.    As an intended third-party beneficiary of the Confidentiality Agreement, TMST and TMHL may pursue all remedies at law against Mr. Goldstone, Mr. Simmons, Ms. Burns and Ms. Pell.

**WHEREFORE**, for the foregoing reasons, the Plaintiff Joel I. Sher, Chapter 11 Trustee respectfully requests the following relief:

A.    That judgment be entered in favor of the Trustee and against Mr. Goldstone, Mr. Simmons, Ms. Burns and Ms. Pell for consequential damages arising from their breach of the implied contract, in amount not less than $5,000,000 to be proven at trial; and

B.    That the Trustee be granted such other and further relief as is just and equitable.

### COUNT X- Fraud, Concealment and Misrepresentation
### Breach of Directors Standard of Care
### Goldstone

210.    The Trustee hereby incorporates the allegations set forth in Paragraphs 1 through 152 and 186 through 209 above, as if more fully set forth in this Count.

211.    As a Director of TMST Mr. Goldstone was obligated to perform his duties as a director in accordance with, *inter alia*, Section 2-405.1 of the Maryland Corporations and Associations Article; which provides that "a director shall perform his duties as a director….(1) in good faith; (2) in a manner he reasonably believes to be in the best interest of the corporation;

and (3) with the care that a reasonably prudent person in a like position would use under similar circumstances."

212.  Beginning no later than the time he and Mr. Simmons first discussed the concept of a "Goldstone/Simmons NEWCO", Mr. Goldstone used his position as a Director of TMST and performed his duties as a director to benefit himself and his cohorts.

213.  Among other things, Mr. Goldstone's (i) misrepresentations to TMST's board members and professionals, (ii) approval of the Unauthorized Payments without obtaining approval from TMST's Board of Directors or its Compensation Committee, (iii) approval of payments to be made to himself, the other Defendants and favored vendors in secrecy, (iv) falsification of his time records, (v) aborted attempt to get board approval for his NEWCO pursuit, (vi) participation in the termination of Pachulski, (vii) efforts to amend TMST's management agreement with TMAC so that TMST would needlessly pay TMAC millions of dollars before filing bankruptcy in an effort to protect his seed money for NEWCO, (viii) misappropriation of TMST's confidential and proprietary information and processes without payment, (ix) attempted manipulation of TMST's Board of Directors' minutes, and (x) secret use of Orrick's services for NEWCO and SAF at the same time TMST was paying Orrick approximately $973,000 purportedly for the Debtors' benefit, demonstrate that he knew that his actions were not in good faith or performed in a  manner he reasonably believed to be in the best interest of TMST.  Instead, Mr. Goldstone's actions and conduct demonstrate that he knew he was acting in bad faith and in a manner that was antithetical to the best interests of TMST and the other Debtors.

214.    Mr. Goldstone's actions as described herein were knowing and intentional and were not taken with the care that a reasonably prudent person in a like position would use under similar circumstances.

215.    Mr. Goldstone's actions as described herein were a breach of the standard of care and duties he owed to TMST pursuant to Section 2-405.1 of the Maryland Corporations and Associations Article.

216.    TMST has been damaged as a result of Goldstone's breach of the standard of care and duties he owed to TMST pursuant to Section 2-405.1 of the Maryland Corporations and Associations Article, including but not limited to:

A.    The Unauthorized Payments in the aggregate sum of $325,000;

B.    The Vendor Payments in the aggregate sum of $1,153,404;

C.    The approximate sum of $2,041,921 that TMST reimbursed TMAC for the lump sum WARN Act payments in April 2009;

D.    The approximate sum of $600,000 that was paid to Venable in the month of April 2009, to recreate the work that had largely already been performed by Kirkland and Pachulski;

E.    The approximate amount of $950,000 in reimbursements paid to TMAC in April 2009;

F.    The $270,000 that TMST reimbursed to TMAC on the day before the Petition Date for the payment made to Mr. MacIntosh;

G.    The approximate sum of $2,000,000 that TMST incurred in fees and expenses billed by Goodwin Procter and Deloitte for confidential work product that Goldstone and his cohorts misappropriated for their own benefit;

H.    The Post Petition salaries paid to Mr. Goldstone in the amount of $316,514, Mr. Simmons in the amount $223,248, Ms. Burns in the amount of $78,015 and Ms. Pell in the amount of $44,284;

I.    The approximate sum of $400,000 in non-executive payroll costs that TMST incurred for employees who provided services for the benefit of SAF;

J.     The use of the Debtors' office space and equipment with an approximate value of $170,000;

K.     The approximate sum of $1,300,000 in legal and professional expenses and costs that TMST incurred related to the independent investigation and the prosecution and defense of the UST Motion; and

L.     The approximate sum of $1,161,000 paid to Orrick during the month preceding the Petition Date through the date of this Complaint..

**WHEREFORE**, for the foregoing reasons, the Plaintiff Joel I. Sher, Chapter 11 Trustee respectfully requests the following relief:

A.     That judgment be entered in favor of the Trustee and against Mr. Goldstone, for damages arising from his breach of the standard of care and duties he owed to TMST pursuant to Section 2-405.1 of the Maryland Corporations and Associations Article, in an amount not less than $12,000,000, to be proven at trial; and

B.     That the Trustee be granted such other and further relief as is just and equitable.

### COUNT XI- Fraud, Concealment and Misrepresentation
### Breach of Duty of Loyalty
### Goldstone, Simmons, Burns, Pell and Dempsey

217.    The Trustee hereby incorporates the allegations set forth in Paragraphs 1 through 152 above, as if more fully set forth in this Count.

218.    As officers of one or more of the Debtors, Mr. Goldstone, Mr. Simmons, Ms. Burns, Ms. Pell and Ms. Dempsey owed a duty of loyalty to TMST and/or TMHL, including, but not limited to (i) avoiding self-dealing and self-interested actions at the expense of the Debtors, and (ii) being candid with and disclosing matters related to their employment and business actions.

219.    Mr. Goldstone, Mr. Simmons, Ms. Burns, Ms. Pell and Ms. Dempsey breached their respective duties of loyalty to TMST and/or TMHL by, among other things, (i) taking the Unauthorized Payments, (ii) making and/or facilitating the Vendor Payments in order to benefit NEWCO/SAF, (iii) attempting to cover up the reason for the Vendor Payments, (iv) misappropriating the confidential and proprietary compilations, business, financial and other documents and records of the Debtors for the use of NEWCO/SAF, and (v) using certain of the Debtors' employees to provide services solely for the benefit of SAF and having the payroll costs for those employees paid by TMST.

220.    Mr. Goldstone, Mr. Simmons and Ms. Dempsey further breached their respective duties of loyalty to TMST and/or TMHL by, among other things (i) their misrepresentations to TMST board members and/or professionals of the Debtors, (ii) their failure to provide full and candid disclosures to TMST board members and/or professionals and (iii) by amending the Amended Management Agreement for their own self interest and benefit.

221.    TMST and TMHL have been damaged as a result of Mr. Goldstone, Mr. Simmons, Ms. Burns, Ms. Pell and Ms. Dempsey breach of their duty of loyalty, including, but not limited to:

A.     The Unauthorized Payments in the aggregate sum of $325,000;

B.     The Vendor Payments in the aggregate sum of $1,153,404;

C.     The approximate sum of  $2,041,921 that TMST reimbursed TMAC for the lump sum WARN Act payments in April 2009;

D.     The approximate sum of $600,000 that was paid to Venable in the month of April 2009, to recreate the work that had largely already been done by Kirkland and Pachulski;

E.     The approximate amount of $950,000 in reimbursements paid to TMAC in April 2009;

F.      The $270,000 that TMST reimbursed to TMAC on the day before the Petition Date for the payment made to Mr. MacIntosh;

G.      The approximate sum of $2,000,000 that TMST incurred in fees and expenses billed by Goodwin Procter and Deloitte for confidential work product that Goldstone and his cohorts misappropriated for their own benefit;

H.      The Post Petition salaries paid to Goldstone in the amount of $316,514, Simmons in the amount $223,248, Burns in the amount of $78,015 and Pell in the amount of $44,284;

I.      The approximate amount of $400,000 in non-executive payroll costs that TMST incurred for employees who provided services for the benefit of SAF;

J.      The use of the Debtors' office space and equipment with an approximate value of $170,000;

K.      The approximate amount of $1,300,000 in legal and professional expenses and costs that TMST incurred related to the independent investigation and the prosecution and defense of the UST Motion; and

L.      The approximate sum of $1,161,000 paid to Orrick during the month preceding the Petition Date through the date of this Complaint..

**WHEREFORE**, for the foregoing reasons, the Plaintiff Joel I. Sher, Chapter 11 Trustee respectfully requests the following relief:

A.      That  judgment be entered in favor of the Trustee and against Mr. Goldstone, Mr. Simmons, Ms. Burns, Ms. Pell and Ms. Dempsey,  for damages arising from their breach of their duty of loyalty to TMST and/or TMHL in amount not less than $12,000,000, to be proven at trial; and

B.      That the Trustee be granted such other and further relief as is just and equitable.

## COUNT XII- Unjust Enrichment
### Goldstone, Simmons and SAF

222.    The Trustee hereby incorporates the allegations set forth in Paragraphs 1 through 152  above, as if more fully set forth in this Count.

64

223.    Messrs. Goldstone and Simmons, individually, and with their alter ego SAF, have been unjustly enriched by, among other things:

A.    Their use of the work product that had been created with the assistance of Goodwin Procter, Deloitte and TMST's employees, at the Debtors' expense, to pursue on their own behalf for personal gain the thrift opportunity and the merger with Union Bank; and

B.    Their use of the Debtors' employees, offices, hardware, software, intellectual property, monies and other assets to pursue for their benefit the thrift opportunity for their own personal gain;

224.    Messrs. Goldstone and Simmons, individually, and through their alter ego SAF, intended and fully appreciated that in using the work product and assets of the Debtors as described herein, they would be benefited and unjustly enriched.

225.    Messrs. Goldstone and Simmons, individually, and through their alter ego SAF, have unjustly accepted and retained the benefits they received under circumstances that would make it inequitable for them to retain such benefits without paying the Debtors for the value thereof.

226.    TMST and TMHL have been damaged as a result of Messrs. Goldstone, Simmons and SAF's use of the Debtors' work product and the benefit they obtained therefrom, including, but not limited to:

A.    The Unauthorized Payments in the aggregate sum of $325,000;

B.    The Vendor Payments in the aggregate sum of $1,153,404;

C.    The $270,000 that TMST reimbursed to TMAC on the day before the Petition Date for the payment made to Mr. MacIntosh;

D.    The approximate sum of $2,000,000 that TMST incurred in fees and expenses billed by Goodwin Procter and Deloitte for confidential work product that Goldstone and his cohorts misappropriated for their own benefit;

E.    The Post Petition Date salaries paid to Goldstone in the amount of $316,514,

Simmons in the amount $223,248, Burns in the amount of $78,015 and Pell in the amount of $44,284;

F.      The approximate amount of $400,000 in non-executive payroll costs that TMST incurred for employees who provided services for the benefit of SAF; and

G.      The use of the Debtors' office space and equipment with an approximate value of $170,000.

227.    The Trustee is entitled to recover restitution damages from Goldstone, Simmons and SAF.

**WHEREFORE**, for the foregoing reasons, the Plaintiff Joel I. Sher, Chapter 11 Trustee respectfully requests the following relief:

A.      That judgment be entered in favor of the Trustee and against Messrs. Goldstone, Simmons and SAF to recover restitution damages in an amount not less than $5,000,000, to be proven at trial; and

B.      That the Trustee be granted such other and further relief as is just and equitable.

**COUNT XIII**
**Civil Conspiracy**
**Goldstone, Simmons, Burns, Pell and Dempsey**

228.    The Trustee hereby incorporates the allegations set forth in Paragraphs 1 through 152 above, as if more fully set forth in this Count.

229.    The various overt acts described herein that Mr. Goldstone, Mr. Simmons, Ms. Burns, Ms. Pell and Ms. Dempsey undertook were in furtherance of an understanding and agreement by and among them to breach their respective duties of loyalty owed to TMST and/or TMHL and misappropriate the tangible and intangible assets of TMST and/or TMHL in order to benefit themselves and NEWCO/SAF.

230.    The overt acts Mr. Goldstone, Mr. Simmons, Ms. Burns, Ms. Pell and Ms. Dempsey undertook in furtherance of their civil conspiracy include, among other things, (i) making and receiving the Unauthorized Payments, (ii) making and/or facilitating the Vendor Payments in order to benefit NEWCO/SAF, (iii) attempting to cover up the reason for the Vendor Payments, (iv) misappropriating the confidential and proprietary compilations, business, financial and other documents and records of the Debtors for the use of NEWCO/SAF, (v) using certain of the Debtors' employees to provide services solely for the benefit of SAF and having those payroll costs paid by TMST, (vi) orchestrating and implementing the execution of the Second Amended Management Agreement and thereafter causing TMST to reimburse TMAC over $2 Million for WARN Act payments, (vii) making misrepresentations concerning, and failing to disclose to the TMST Board of Directors, the true motive for the Second Amended Management Agreement, as well as  failing to disclose the contrary advice of Pachulski, (viii) making misrepresentations to the TMST Board of Directors and professionals concerning the status of NEWCO and the extent to which assets of the Debtors were being used to promote it, (ix) attempting to manipulate the minutes of a Board of Directors meeting, (x) the execution by Simmons of the Debtors' Statement Pursuant to Local Bankruptcy Rule 2015-1(b), and (xi) manipulating how employees recorded their time in the actiTIME system in order to shift SAF payroll costs over to TMST.

231.    TMST and TMHL have been damaged as a result of Mr. Goldstone, Mr. Simmons, Ms. Burns, Ms. Pell and Ms. Dempsey's civil conspiracy, including but not limited to:

A.    The Unauthorized Payments in the aggregate sum of $325,000;

B.    The Vendor Payments in the aggregate sum of $1,153,404;

C.    The approximate sum of  $2,041,921 that TMST reimbursed TMAC for the lump

sum WARN Act payments in April 2009;

D.     The approximate sum of $1,000,000 that was paid to Pachulski and Kirkland;

E.     The approximate sum of $600,000 paid to Venable in the month of April 2009, to recreate the work that had largely already been done by Kirkland and Pachulski;

F.     The approximate amount of $950,000 in reimbursements paid to TMAC in April 2009;

G.     The $270,000 that TMST reimbursed to TMAC on the day before the Petition Date for the payment made to Mr. MacIntosh;

H.     The approximate sum of $2,000,000 that TMST incurred in fees and expenses billed by Goodwin Procter and Deloitte for confidential work product that Goldstone and his cohorts misappropriated for their own benefit;

I.     The Post Petition Date salaries paid to Goldstone in the amount of $316,514, Simmons in the amount $223,248, Burns in the amount of $78,015 and Pell in the amount of $44,284;

J.     The approximate amount of $400,000 in non-executive payroll costs that TMST incurred for employees who provided services for the benefit of SAF;

K.     The use of the Debtors' office space and equipment with an  approximate value of $170,000;

L.     The approximate amount of $1,300,000 in legal and professional expenses and costs that TMST incurred related to the independent investigation and the prosecution and defense of the UST Motion; and

M.     The approximate sum of $1,161,000 paid to Orrick during the month preceding the Petition Date through the date of this Complaint.

**WHEREFORE**, for the foregoing reasons, the Plaintiff Joel I. Sher, Chapter 11 Trustee respectfully requests the following relief:

A.     That  judgment be entered in favor of the Trustee and against Mr. Goldstone, Mr. Simmons, Ms. Burns, Ms. Pell and Ms. Dempsey, for damages arising from their civil conspiracy in an amount not less than $12,000,000, to be proven at trial; and

B.     That the Trustee be granted such other and further relief as is just and equitable.

## COUNT XIV
## Aiding and Abetting Breach of Fiduciary Duty
## Burns, Pell and Dempsey

232.    The Trustee hereby incorporates the allegations set forth in Paragraphs 1 through 152 above, as if more fully set forth in this Count.

233.    Messrs. Goldstone and Simmons had a duty of loyalty to the Debtors and all of their creditors and owed the Debtors and all of their creditors fiduciary duties and duties of loyalty, good faith and care.

234.    Messrs. Goldstone and Simmons breached their duty of loyalty to the Debtors and their fiduciary duties and duties of loyalty, good faith and care to the Debtors and all of their creditors by, among other things, (i) taking the Unauthorized Payments, (ii) making and/or facilitating the Vendor Payments in order to benefit NEWCO/SAF, (iii) misappropriating the confidential and proprietary compilations, business, financial and other documents and records of the Debtors for the use of NEWCO/SAF, (iv) using certain of the Debtors' employees to provide services solely for the benefit of SAF and having the payroll costs for those employees paid by TMST, (vi) making misrepresentations to TMST's Board of Directors, creditors and the Bankruptcy Court, (vii) misappropriating the Debtors' assets for their use and the use of NEWCO/SAF, and (viii) failing to maximize the value of the Debtors' assets for the benefit of creditors.

235.    The acts undertaken by Ms. Burns, Ms. Pell and Ms. Dempsey as described herein provided substantial assistance to and enabled Messrs. Goldstone and Simmons to take acts that were in breach of their respective duties as described herein.

236.    Ms. Burns, Ms. Pell and Ms. Dempsey were each aware of and had actual knowledge of the wrongful conduct of Messrs. Goldstone and Simmons and their respective roles in furthering that wrongful conduct.

237.    Ms. Burns, Ms. Pell and Ms. Dempsey knew that Messrs. Goldstone and Simmons would breach their duty of loyalty to the Debtors and their fiduciary duties and duties of loyalty, good faith and care to the Debtors and all of their creditors by agreeing to and taking part in the transactions referred to herein.

**WHEREFORE**, for the foregoing reasons, the Plaintiff Joel I. Sher, Chapter 11 Trustee respectfully requests the following relief:

A       That  judgment be entered in favor of the Plaintiff and against Ms. Burns, Ms. Pell and Ms. Dempsey, jointly and severally,  for damages arising their aiding and abetting the breach by Messrs. Goldstone and their duty of loyalty to the Debtors and their fiduciary duties and duties of loyalty, good faith and care to the Debtors and all of their creditors in an amount not less than $12,000,000, to be proven at trial; and

B.      That the Plaintiff be granted such other and further relief as is just and equitable.

### COUNT XV
### Legal Malpractice
### Dempsey and Orrick

238.    The Trustee hereby incorporates the allegations set forth in Paragraphs 1 through 152 above, as if more fully set forth in this Count.

239.    At all relevant times, an attorney-client relationship existed between Dempsey and the Debtors whereby Dempsey owed the Debtors a duty of care to use such skill, prudence and diligence as members of her profession commonly possess and exercise.

240.    Dempsey breached her duty of care to use such skill, prudence and diligence as members of her profession commonly possess and exercise to the Debtors by, among other things:

a.    Undertaking representation of Messrs. Goldstone and Simmons in connection with their scheme to form NEWCO to pursue the Thrift Strategy, even though Messrs. Goldstone's and Simmons' interests were directly and materially adverse to Dempsey's clients, the Debtors;

b.    Counseling Messrs. Goldstone and Simmons regarding means and methods to secure reimbursement from TMST to TMAC for inappropriate expenses, such as lump sum WARN Act payments when the purpose of such reimbursements was not to benefit her client, TMST, but, among other things, to enable Messrs. Goldstone and Simmons to obtain sufficient capital to fund NEWCO for their benefit ;

c.    Participating in the termination of Pachulski;

d.    Assisting in the negotiation and drafting of the revised Amended Management Agreement between TMST and TMAC for the benefit of Goldstone/Simmons/NEWCO to the detriment of her client, TMST;

e.    Failing to disclose to TMST's Board of Directors that the purpose of the revised Amended Management Agreement was to enable TMAC to be reimbursed pre-petition for the lump sum WARN ACT payment in order, among other things, to protect Messrs. Goldstone's and Simmons' ability to obtain funding for NEWCO, all to the detriment of her client TMST;

f.    Failing to disclose to TMST's Board of Directors that both Kirkland and Pachulski counseled against TMST making reimbursements to TMAC without first obtaining approval from the bankruptcy court;

g.    Failing to disclose to TMST's Board of Directors that Messrs. Goldstone and Simmons were not merely "looking" at forming a thrift holding company that TMAC might finance, but that they were actively pursuing that opportunity and had already used, without permission, TMST assets, money, and proprietary information to further their efforts with the NEWCO thrift strategy;

h.    Failing to disclose to TMST's Board of Directors and the Bankruptcy Court that she was actively representing Messrs Goldstone and Simmons in their pursuit of the thrift opportunity; and

i.    Attempting to manipulate the minutes of TMST's April 26, 2009 Board of Directors meeting to make it falsely appear as if counsel for TMST had approved Messrs. Goldstone's and Simmons' pursuit of the thrift opportunity at that time.

241.   As a direct and proximate result of Dempsey's breaches and actions as described above, TMST was damaged in an amount not less than $10,000,000.

242.   At all relevant times, Dempsey was a partner attorney with Orrick, and functioned as the agent, servant, and/or employee of Orrick.  Dempsey's actions described above occurred within the scope of her agency, servitude, and/or employment with Orrick, and were done in furtherance of Orrick's business.  Orrick is thus liable for the actions of, and damages caused by, Dempsey under the doctrine of *respondeat superior*.

**WHEREFORE**, for the foregoing reasons, the Plaintiff Joel I. Sher, Chapter 11 Trustee respectfully requests the following relief:

A.    That judgment be entered in favor of the Trustee and against Ms. Dempsey and Orrick, jointly and severally, in an amount not less than $10,000,000, to be proven at trial, plus interest, costs, attorneys' fees; and

B.    That the Trustee be granted such other and further relief as is just and equitable .

## COUNT XVI
### Legal Malpractice-Breach of Fiduciary Duty
### <u>Dempsey and Orrick</u>

243.   The Trustee hereby incorporates the allegations set forth in Paragraphs 1 through 152 above, as if more fully set forth in this Count.

244.   At all relevant times an attorney-client relationship existed between Dempsey and the Debtors whereby Dempsey owed the Debtors a fiduciary duty of trust and loyalty.

245.   Dempsey breached her fiduciary duty of trust and loyalty to the Debtors by, among other things:

a.  Undertaking representation of Messrs. Goldstone and Simmons in connection with their scheme to form NEWCO to pursue the Thrift Strategy, even though Messrs. Goldstone's and Simmons' interests were directly and materially adverse to Dempsey's clients, the Debtors;

b.  Counseling Messrs. Goldstone and Simmons regarding means and methods to secure reimbursement from TMST to TMAC of inappropriate expenses, such as accelerated lump sum WARN Act payments when the purpose of such reimbursements was not to benefit her client, TMST, but to enable Messrs. Goldstone and Simmons to obtain sufficient capital to fund NEWCO for their benefit;

c.  Participating in the termination of Pachulski;

d.  Assisting in the negotiation and drafting the revised Amended Management Agreement between TMST and TMAC for the benefit of Goldstone/Simmons/NEWCO and to the detriment of her client, TMST;

e.  Failing to disclose to TMST's Board of Directors that the purpose of the revised Amended Management Agreement was to enable TMAC to be reimbursed pre-petition for the lump sum WARN Act payment in order, among other things, to protect Messrs. Goldstone and Simmons ability to obtain funding for NEWCO, all to the detriment of TMST;

f.  Failing to disclose to TMST's Board of Directors that both Kirkland and Pachulski counseled against TMST making any reimbursements to TMAC without first obtaining approval from the bankruptcy court;

g.  Failing to disclose to TMST's Board of Directors that Messrs. Goldstone and Simmons were not merely "looking" at forming a thrift holding company that TMAC might finance, but that they were actively pursuing that opportunity, and had already used, without permission, TMST assets, money, and proprietary information to further their efforts with the NEWCO thrift strategy,;

h.  Failing to disclose to TMST's Board of Directors and the Bankruptcy Court that she was actively representing Messrs Goldstone and Simmons in their pursuit of the thrift opportunity; and

i.  Attempting to manipulate the minutes of TMST's April 26, 2009 Board of Directors meeting to make it falsely appear as if counsel for TMST had approved Messrs. Goldstone and Simmons' pursuit of the thrift opportunity at that time.

246.  As a direct and proximate result of Dempsey's breaches and actions described above, TMST was damaged in an amount not less than $10,000,000.

247. At all relevant times, Dempsey was a partner attorney with Orrick, and functioned as the agent, servant, and/or employee of Orrick. Dempsey's actions as described above occurred within the scope of her agency, servitude, and/or employment with Orrick, and were done in furtherance of Orrick's business. Orrick is thus liable for the actions of, and damages caused by, Dempsey under the doctrine of *respondeat superior*.

**WHEREFORE**, for the foregoing reasons, the Plaintiff Joel I. Sher, Chapter 11 Trustee respectfully requests the following relief:

A. That judgment be entered in favor of the Trustee and against Ms. Dempsey and Orrick, jointly and severally in an amount not less than $10,000,000, to be proven at trial, plus interest, costs, attorneys' fees; and

B. That the Trustee be granted such other and further relief as is just and equitable.

## COUNT XVII
### Legal Malpractice-Undisclosed Conflict of Interest
### Dempsey and Orrick

248. The Trustee hereby incorporates the allegations set forth in Paragraphs 1 through 152 above, as if more fully set forth in this Count.

249. At all relevant times, an attorney-client relationship existed between Dempsey and the Debtors whereby Dempsey owed the Debtors a duty of care to use such skill, prudence and diligence as members of her profession commonly possess and exercise.

250. Dempsey also owed the Debtors her undivided loyalty.

251. Dempsey breached her duty of undivided loyalty to the Debtors by, among other things:

a. Undertaking representation of Messrs. Goldstone and Simmons in connection with their scheme to form NEWCO to pursue the Thrift Strategy, even though

Messrs. Goldstone's and Simmons' interests were directly and materially adverse to Dempsey's clients, the Debtors;

b.    Counseling Messrs. Goldstone and Simmons regarding means and methods to secure reimbursement from TMST to TMAC of inappropriate expenses, such as accelerated lump sum WARN Act payments when the purpose of such reimbursements was not to benefit her client, TMST, but, among other things, to enable Messrs. Goldstone and Simmons to obtain sufficient capital to fund NEWCO for their benefit;

c.    Participating in the termination of Pachulski;

d.    Assisting in the negotiation and drafting of the revised Amended Management Agreement between TMST and TMAC for the benefit of Goldstone/Simmons/NEWCO and to the detriment of her client, TMST;

e.    Failing to disclose to TMST's Board of Directors that the purpose of the revised Amended Management Agreement was to enable TMAC to be reimbursed pre-petition for the lump sum WARN ACT payment in order, among other things to protect Messrs. Goldstone and Simmons' ability to obtain funding for NEWCO, all to the detriment of her client TMST;

f.    Failing to disclose to TMST's Board of Directors that both Kirkland and Pachulski counseled against TMST making reimbursements to TMAC without first obtaining approval from the bankruptcy court;

g.    Failing to disclose to TMST's Board of Directors that Messrs. Goldstone and Simmons were not merely "looking" at forming a thrift holding company that TMAC might finance, but that they were actively pursuing that opportunity, and had already used, without permission, TMST assets, money, and proprietary information to further their efforts with the NEWCO thrift strategy; Failing to disclose to TMST's Board of Directors and the Bankruptcy Court that she was actively representing Messrs Goldstone and Simmons in their pursuit of the thrift opportunity;

h.    Failing to disclose to TMST's Board of Directors and the Bankruptcy Court that she and Orrick were actively representing SAF; and

i.    Attempting to manipulate the minutes of TMST's April 26, 2009 Board of Directors meeting to make it falsely appear as if counsel for TMST had approved Messrs. Goldstone and Simmons' pursuit of the thrift opportunity at that time.

252.    As a direct and proximate result of Dempsey's breaches and actions described above, TMST was damaged in an amount not less than $10,000,000.

253.   At all relevant times, Dempsey was a partner attorney with Orrick, and functioned as the agent, servant, and/or employee of Orrick. Dempsey's actions as described above occurred within the scope of her agency, servitude, and/or employment with Orrick, and were done in furtherance of Orrick's business. Orrick is thus liable for the actions of, and damages caused by, Dempsey under the doctrine of *respondeat superior*.

**WHEREFORE**, for the foregoing reasons, the Plaintiff Joel I. Sher, Chapter 11 Trustee respectfully requests the following relief:

A.   That  judgment be entered in favor of the Trustee and against Ms. Dempsey and Orrick, jointly and severally in an amount not less than $10,000,000, to be proven at trial, plus interest, costs, attorneys' fees; and

B.   That the Trustee be granted such other and further relief as is just and equitable.

**COUNT XVIII**
**Fraudulent Misrepresentation/Concealment**
**Dempsey and Orrick**

254.   The Trustee hereby incorporates the allegations set forth in Paragraphs 1 through 152 above, as if more fully set forth in this Count.

255.   At all relevant times an attorney-client relationship existed between Dempsey and the Debtors whereby Dempsey owed the Debtors a fiduciary duty of trust and loyalty.

256.   At all relevant times Dempsey served as an Officer of TMST, and as such, owed TMST a duty of trust and loyalty.

257.   The duty Dempsey owed to TMST and the Debtors included the duty to disclose information in a candid fashion, and not conceal or misrepresent information.

258.   Dempsey intentionally failed to disclose to, and otherwise concealed from, TMST's Board of Directors, the following information:

a. That she had undertaken representation of Messrs. Goldstone and Simmons in connection with their scheme to form NEWCO to pursue the Thrift Strategy;

b. That she was counseling Messrs. Goldstone and Simmons regarding means and methods to secure reimbursement from TMST to TMAC of inappropriate expenses, such as lump sum WARN Act payments when the purpose of such reimbursements was not to benefit her client, TMST, but, among other things, to enable Messrs. Goldstone and Simmons to obtain sufficient capital to fund NEWCO for their benefit;

c. The actual reasons for the termination of Pachulski;

d. That the purpose of the revised Amended Management Agreement was to enable TMAC to be reimbursed pre-petition for the lump sum WARN ACT payment in order, among other things to protect Messrs. Goldstone and Simmons ability to obtain funding for NEWCO, all to the detriment of TMST;

e. That both Kirkland and Pachulski counseled against TMST making any reimbursements to TMAC without first obtaining approval from the bankruptcy court;

f. That Messrs. Goldstone and Simmons were not merely "looking" at forming a thrift holding company that TMAC might finance, but that they were actively pursuing that opportunity, and had already used, without permission, TMST assets, money, and proprietary information to further their efforts with the NEWCO thrift strategy;

g. That she was actively representing Messrs Goldstone and Simmons in their pursuit of the thrift opportunity; and

h. That she and Orrick were actively representing SAF.

259. Dempsey knew that the information she concealed and failed to disclose was relevant, critical, and material information of the type that TMST's Board of Directors would rely upon and benefit from in its decision-making process.

260. Dempsey failed to disclose the above information to TMST's Board of Directors with the intent that the Board, relying on the lack of information provided, would not intervene to prevent the improper conduct that Messrs. Goldstone and Simmons had engineered for their own benefit, to TMST's detriment.

77

261.    TMST's Board of Directors justifiably relied on Dempsey's silence and counsel—in the face of her and Mr. Goldstone's affirmative misrepresentations.

262.    As a direct and proximate result of Dempsey's misrepresentations and concealment described above, TMST was damaged in an amount not less than $10,000,000.

263.    At all relevant times, Dempsey was a partner attorney with Orrick, and functioned as the agent, servant, and/or employee of Orrick.    Dempsey's actions as described above occurred within the scope of her agency, servitude, and/or employment with Orrick, and were done in furtherance of Orrick's business.    Orrick is thus liable for the actions of, and damages caused by Dempsey under the doctrine of *respondeat superior*.

**WHEREFORE**, for the foregoing reasons, the Plaintiff Joel I. Sher, Chapter 11 Trustee respectfully requests the following relief:

A.    That judgment be entered in favor of the Trustee and against Ms. Dempsey and Orrick, jointly and severally in an amount not less than $10,000,000, to be proven at trial, plus interest, costs, attorneys' fees; and

B.    That the Trustee be granted such other and further relief as is just and equitable.

**COUNT XVIX**
**Negligent Misrepresentation**
**Dempsey and Orrick**

264.    The Trustee hereby incorporates the allegations set forth in Paragraphs 1 through 152 above, as if more fully set forth in this Count.

265.    At all relevant times, an attorney-client relationship existed between Dempsey and the Debtors whereby Dempsey owed the Debtors a fiduciary duty of trust and loyalty.

266.    The duty Dempsey owed to TMST and the Debtors included the duty to disclose information in a candid fashion, and to not conceal information.

267.    Dempsey negligently failed to disclose to, and otherwise concealed from, TMST's

Board of Directors, the following information:

a.    That she had undertaken representation of Messrs. Goldstone and Simmons in
connection with their scheme to form NEWCO to pursue the Thrift Strategy;

b.    That she was counseling Messrs. Goldstone and Simmons regarding means and
methods to secure reimbursement from TMST to   TMAC of inappropriate
expenses, such as lump sum WARN Act payments when the purpose of such
reimbursements was not to benefit her client, TMST, but, among other things, to
enable Messrs. Goldstone and Simmons to obtain sufficient capital to fund
NEWCO for their  benefit;

c.    The actual reasons for the termination of Pachulski;

d.    That the purpose of the revised Amended Management Agreement was to enable
TMAC to be reimbursed pre-petition for the lump sum WARN ACT payment in
order, among other things, to protect Messrs. Goldstone and Simmons' ability to
obtain funding for NEWCO, all to the detriment of TMST;

e.    That both Kirkland and Pachulski counseled against TMST making
reimbursements to TMAC without first obtaining approval from the bankruptcy
court;

f.    That  Messrs. Goldstone and Simmons were not merely "looking" at forming a
thrift holding company that TMAC might finance, but that they were actively
pursuing that opportunity, and had already used, without permission, TMST
assets, money, and proprietary information to further their efforts with the
NEWCO thrift strategy;

g.    That she was actively representing Messrs Goldstone and Simmons in their
pursuit of the thrift opportunity; and

h.    That she and Orrick were actively representing SAF.

268.    Dempsey knew, or in the exercise of reasonable care should have known, that the

information she failed to disclose was relevant, critical, and material information of the type that

TMST's Board of Directors would rely upon and benefit from in its decision-making process.

269.    Dempsey knew, or in the exercise of reasonable care should have known, that

TMST's Board of Directors, in reliance on the lack of information provided, would not intervene

to prevent the improper conduct that Messrs. Goldstone and Simmons were engineering for their own benefit (and to TMST's detriment).

270.    TMST's Board of Directors' justifiably relied on Dempsey's counsel, in the face of her and Mr. Goldstone's affirmative misrepresentations.

271.    As a direct and proximate result of Dempsey's misrepresentations and concealment described above, TMST was damaged in an amount not less than $10,000,000.

272.    At all relevant times, Dempsey was a partner attorney with Orrick, and functioned as the agent, servant, and/or employee of Orrick.  Dempsey's actions as described above occurred within the scope of her agency, servitude, and/or employment with Orrick, and were done in furtherance of Orrick's business.  Orrick is thus liable for the actions of, and damages caused by, Dempsey, under the doctrine of *respondeat superior*.

**WHEREFORE**, for the foregoing reasons, the Plaintiff Joel I. Sher, Chapter 11 Trustee respectfully requests the following relief:

A.    That  judgment be entered in favor of the Trustee and against Ms. Dempsey and Orrick, jointly and severally in an amount not less than $10,000,000, to be proven at trial, plus interest, costs, attorneys' fees; and

B.    That the Trustee be granted such other and further relief as is just and equitable.

**COUNT XX**
**Disallowance of Fees**
**<u>Orrick</u>**

273.    The Trustee hereby incorporates the allegations set forth in Paragraphs 1 through 152 above, as if more fully set forth in this Count.

274.    By order entered on May 14, 2009 [Docket No. 85], the Bankruptcy Court established a procedure by which professionals employed by the Debtors in their bankruptcy cases could file monthly statements seeking interim compensation.

275.    After the Petition Date, Orrick filed four Monthly Statements for services rendered and expenses incurred in connection with their services as Special Counsel to the Debtors.  On September 30, 2009, Orrick filed its First Application for Interim Compensation [Docket No. 408], seeking interim allowance of compensation for fees in the amount of $603,898.00 and expenses of $9,637.76, for the period May 1, 2009 through August 31, 2009.

276.    Thereafter, on October 13, 2009, Orrick filed a notice in which, inter alia, it withdrew its request for interim compensation [Docket No. 446].

277.    The allowance of Orrick's fees for services rendered and expenses incurred in connection with their services as Special Counsel to the Debtors is subject to order of the Bankruptcy Court pursuant to Sections 327, 328, 329 and 330 of the Bankruptcy Code.

278.    Section 328 of the Bankruptcy Code provides that the Bankruptcy Court may deny allowance of compensation for services rendered and expenses incurred by a professional employed under Section 327 of the Bankruptcy Code, if, *inter alia*, such professional at any time during its employment held an interest adverse to the interest of the estate of a debtor with respect to the matters for which they were employed.

279.    As more fully set forth herein, at times prior to the Petition Date and all periods thereafter during which Orrick was employed by the Debtors, Orrick held an interest adverse to the interest of the estates of the Debtors with respect to the matters for which they were employed.

81

**WHEREFORE**, for the foregoing reasons, the Plaintiff Joel I. Sher, Chapter 11 Trustee respectfully requests the following relief:

A.    That the Court enter an order finding that at least since the Petition Date Orrick held an interest adverse to the interest of the estates of the Debtors with respect to the matters for which they were employed by the Debtors;

B.    That the Court enter an order denying any and all allowance of compensation for services rendered and expenses incurred by Orrick for all services rendered in connection with their engagement as Special Counsel to the Debtors;

C.    That the Court enter an order requiring Orrick to disgorge any and all sums applied by Orrick after the Petition Date from any retainer paid to Orrick from TMST;

D.    That with respect to services rendered by Orrick in connection with their engagement as Special Counsel to the Debtors, the Court enter an order requiring Orrick to disgorge any and all sums paid by the Debtors to Orrick, or applied by Orrick from any retainer received from the Debtors; and

E.    That the Trustee be granted such other and further relief as is just and equitable.


Dated:  March 2, 2009                    /s/      Joel I. Sher
                                         Joel I. Sher, Bar No. 00719
                                         Richard M. Goldberg, Bar No. 07994
                                         SHAPIRO SHER GUINOT & SANDLER
                                         36 South Charles Street, 20th Floor
                                         Baltimore, MD   21201-3147
                                          (410) 385-0202

                                         *Counsel for the Trustee*