IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

Joel I. Sher, Chapter 11 Trustee,          *

    Plaintiff,                                      *

       v.                                            *          Civil Action No.: RDB 10-1895

SAF Financial, Inc., *et al.*,              *

    Defendants.                                 *

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## MEMORANDUM ORDER

Joel I. Sher, Chapter 11 Trustee for TMST, Inc., f/k/a Thornburg Mortgage, Inc., filed a twenty-count complaint alleging that Defendants Larry A. Goldstone, Clarence G. Simmons III, Deborah J. Burns, Amy Pell, SAF Financial, Inc., Karen A. Dempsey and Orrick, Herrington & Sutcliffe LLP (collectively, "Defendants") provided deficient corporate and legal services to the now bankrupt company. Pending before this Court are four separate motions to dismiss filed by various groupings of the defendants. The parties have fully briefed the issues and this Court held a hearing on September 17, 2010. On September 20, 2010, this Court issued a post-hearing Order with respect to certain counts, dismissing Counts VII (Breach of Contract), VIII (Breach of Contract), XI (Breach of Duty of Loyalty) and XIV (Aiding and Abetting Breach of Fiduciary Duty) and denying the applicable motions to dismiss Counts V (Turnover of Property), X (Breach of Standard of Care) and XX (Disallowance of Fees). For the reasons that follow, Defendants' Motions to Dismiss (Paper Nos. 25, 27, 29 & 30) are GRANTED IN PART, and DENIED IN PART.

BACKGROUND

In ruling on a motion to dismiss, "[t]he factual allegations in the plaintiff's complaint must be accepted as true and those facts must be construed in the light most favorable to the plaintiff." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999).

I.     **Parties to Litigation**

Debtor TMST, Inc. ("TMST")[1], a company that invested in high-quality residential mortgages and residential mortgage-backed securities, is incorporated in Maryland and has its principal place of business in Santa Fe, New Mexico.  Compl. ¶¶ 19, 22.  On May 1, 2009, TMST filed voluntary Chapter 11 petitions in the United States Bankruptcy Court for the District of Maryland.  *Id.* ¶ 12.  Prior to the petition date, TMST paid a $2 million base management fee to Thornburg Mortgage Advisory Corp ("TMAC") to manage its business, financial, human resource and daily operations.  *Id.* ¶¶ 24, 28.  Thus, before May 1, 2009, all of TMST's corporate functions were carried out by individuals supplied and paid for by TMAC as its management company.

At the time TMST filed for bankruptcy, Garrett Thornburg served both as TMST's Chairman of Board of Directors and as TMAC's majority shareholder.  *Id.* ¶ 26.  Additionally, the individually named defendants held the following positions at TMST:

- Larry A. Goldstone — Director, Chief Executive Officer and President.  *Id.* ¶ 2.

- Clarence G. Simmons — Chief Financial Officer and Senior Executive Vice President. *Id.* ¶ 3.

- Deborah J. Burns — Senior Vice President of Structured Finance and Assistant Secretary. *Id.* ¶ 4.

---

[1] This Court will refer to TMST, Inc. and the related filed debtor entities — TMST Acquisition Subsidiary, Inc., TMST Home Loans, Inc. and TMST Hedging Strategies, Inc. — collectively as TMST.

- Amy Pell — Senior Vice President and Director of Investor Relations and Corporate Communications.  *Id*. ¶ 5.

- Karen A. Dempsey - Assistant Secretary and Counsel.  *Id*. ¶ 7.

Both Defendants Goldstone and Simmons had equity interests in and were Managing Directors of TMAC during the relevant time periods.  *Id*. ¶ 27.

Trustee alleges that Defendant SAF Financial, Inc. ("SAF"), initially referred to as "Newco," is a corporation which Defendants Goldstone, Simmons, Burns and Pell started for their own economic gain with Thornburg.  It is alleged that TMAC provided financial backing after it became clear that TMST was headed towards bankruptcy.  *Id*. ¶¶ 54, 57.

Defendant Orrick, Herrington & Sutcliffe LLP ("Orrick") is a California-based law firm that provided legal services to both TMST and TMAC.  *Id*. ¶¶ 7, 9.  Defendant Dempsey is a partner at Orrick.  *Id*. ¶ 52.

## II.    TMST Faces Financial Pressures

In 2007, TMST faced increasing economic pressures due to the deteriorating financial markets.  *Id*. ¶ 31.  In October 2007, TMST's Board of Directors began investing money to explore the option of forming a federally-chartered thrift bank to alleviate some of TMST's financial concerns and to provide access to financing necessary to continue acquiring and originating mortgages.  *Id*. ¶¶ 31-33.  As TMST's two senior officers, Goldstone and Simmons had primary responsibility for developing this thrift strategy.  *Id*. ¶ 32.  Over the next year and a half, TMST paid over $1.5 million to a law firm and $500,000 to an accounting firm to explore and pursue this thrift strategy.  *Id*. ¶¶ 33, 37.  Goldstone and Simmons eventually concluded in September 2008 that acquiring an existing bank was the best way to implement the thrift strategy.  *Id*. ¶ 41.  By the beginning of March 2009, however, TMST had not obtained approval for this plan from the Office of Thrift Supervision, which regulates federal banks.  *Id*. ¶ 46.  Over

the first weekend in March 2009, Goldstone and Simmons began to realize that TMST might

need to file for bankruptcy protection pursuant to Chapter 11 of the Bankruptcy Code, 11 U.S.C.

§§ 1101 *et seq.*, as they learned that certain repo counterparties would not support TMST's plans

to restructure.  *Id.* ¶¶ 48, 49.  As a result, on or about March 9, 2009, TMST began working on

bankruptcy planning with its outside restructuring counsel, Kirkland & Ellis LLP.  *Id.* ¶ 52.

TMST also began to pay millions of dollars in fees to various professionals to begin working on

bankruptcy planning, including a $750,000 retainer to Defendant Orrick and a $650,000 retainer

to Goodwin Procter.  *Id.* ¶ 52.

## III.    Improper Payments

Trustee alleges that once Goldstone and Simmons came to the conclusion that TMST was

going bankrupt, their concerns about TMST's ability to continue paying TMAC for its

management services began overshadowing and directing their decisions for TMST.  *Id.* ¶ 64.

As a result, Goldstone and Simmons, with Burns and Pell's assistance, allegedly made a number

of payments in violation of TMST's policies.  For example, on March 9, 2009, Simmons directed

TMST to pre-pay TMAC's $2 million base management fee for March 2009, even though the

pertinent management agreement provided that this fee should not be paid until April 2009.

Compl. ¶ 51.  In the latter part of March 2009, Simmons again sought to pre-pay TMAC's $2

million base management fee for the month of April.  *Id.* ¶ 63.  In response to Burns's request for

approval of this pre-payment, Kirkland & Ellis advised Burns and Simmons that TMST should

not pay the management fee until after it filed for bankruptcy and obtained express approval to

make the payment from the bankruptcy court.  *Id.*

It is alleged that on March 29, 2009, approximately one hour before a scheduled phone

call between TMST's Board of Directors, Goldstone and Simmons authorized TMAC to secretly

pay unauthorized bonuses totaling $325,000 to themselves, Burns and Pell. *Id.* ¶ 59. Goldstone contacted Brian Cesare, one of TMAC's human resources employees responsible for handling both TMAC's and TMST's payroll, and told him to make the payments, but cautioned: "Four checks approved. Delete PF. SSHHH." *Id.* ¶ 60. On the Board call later that day, none of these individuals mentioned the bonus payments. *Id.* On March 31, 2009, TMST's Board of Directors met and formally determined that TMST would file for bankruptcy. *Id.* ¶ 67. On April 3, 2009, bonuses were paid to Goldstone ($140,000), Simmons ($92,000), Burns ($53,000) and Pell ($40,000) out of the ordinary course of payroll. *Id.* ¶ 61. On April 15, 2009, Goldstone and Simmons directed TMST to reimburse TMAC for these payments. *Id.* ¶ 62.

Trustee contends that after realizing TMST was going bankrupt, Defendants Goldstone and Simmons proceeded with their secret plan to form SAF Financial, Inc. with Burns, Pell and Dempsey. *Id.* ¶¶ 54, 57. At some point in March 2009, Goldstone and Simmons approached Garrett Thornburg about providing funding to SAF, either individually or through TMAC. *Id.* ¶¶ 67-68, 134-36. After the March 31, 2009 board meeting, however, Thornburg realized that TMAC could not afford to provide employees and start-up costs to SAF due to its current management agreement with TMST. *Id.* ¶ 67. Under that agreement, TMST reimbursed TMAC for its expenses after the end of each month. *Id.* Therefore, if TMST declared bankruptcy in April 2009, TMAC would not get reimbursed for any work it performed that month. *Id.* ¶ 68.

Specifically, it is alleged that Thornburg was concerned about the severance payments that TMAC would be expected to pay to TMST's employees in April that could cost several million dollars, and which would not be reimbursed if TMST declared bankruptcy before May 1. *Id.* ¶ 67. Accordingly, on April 3, 2009, Thornburg advised Goldstone that TMAC could not afford to make those severance payments and provide employees and start-up costs to SAF. *Id.*

A series of emails followed between Goldstone, Thornburg, Dempsey and TMAC's outside counsel, Paul Fish, about when and how the severance payments should be made.  *Id.* ¶¶ 68-73. Thornburg advocated amending TMAC's management agreement so that TMAC would be immediately repaid by TMST for the cost of the severance payments.  *Id.* ¶¶ 68-73.  Goldstone subsequently drafted an amended management agreement providing TMAC would be "pre-approved" for immediate reimbursement.  *Id.* ¶ 76.

At a meeting of the Board of Directors on April 8, 2009, Goldstone and Dempsey proposed this revised management agreement, explaining that the intent of the amendments was to eliminate any profit to TMAC "for the benefit of creditors."  *Id.* ¶ 78.  Goldstone did not give any indication that the impetus for revising the agreement was to ensure Thornburg would finance SAF.  *Id.*  Dempsey, who was also present at this meeting, did not contradict the reasons Goldstone provided for the revisions.  *Id.* ¶ 79.  The Board of Directors approved of the revisions.  *Id.* ¶ 81.  Thus, in April 2009, TMST paid TMAC approximately $950,000 for expenses that had been covered by the base management fee under the previous management agreement and would previously have been paid after the end of the month.  *Id.* ¶ 82.

## IV.    Vendor Payments

Trustee alleges that in March and April of 2009, Goldstone and Simmons essentially looted TMST by acquiring TMST's intellectual property rights and by directing TMST to pay funds to certain vendors for their own and SAF's purposes.  *Id.* ¶ 89.  Specifically, Goldstone and Simmons are alleged to have directed TMST and TMAC to pay three vendors.  First, on March 31, 2009, TMST paid $382,098.75 to Big Tree Inc. d/b/a 3t Systems ("3t"), the licensor of TMST's loan origination software application, for services through October 2009.  This payment was made even though TMST had not originated any mortgage loans since June 2008 and had no

intention of doing so in the future. *Id.* ¶ 90. Second, on April 15, 2009 and April 30, 2009,

TMAC paid $31,834 and $574,472, respectively, to SS&C Technologies, Inc. ("SS&C"), a

licensor of software that manages an integrated mortgage backed security portfolio. *Id.* ¶ 91.

On April 30, 2009, Simmons directed TMST to reimburse TMAC for the total payment of

$606,306 to TMAC. *Id.* TMST had never fully implemented SS&C's software. *Id.* Third, on

March 16, 2009, TMST paid Ketchum, an investor relations and marketing firm, $165,000 for

services through June 2009. *Id.* ¶ 93. TMST no longer needed Ketchum's services at this point

and this payment was not due until April 12, 2009. *Id.*

**V.     Misappropriation of Confidential Information**

    Trustee claims that in April 2009, Goldstone, Simmons, Burns and Pell began

misappropriating TMST's confidential information and intellectual property for SAF's benefit.

At some point in April, for example, Pell proposed that SAF attract investors by creating an

"opportunity fund" comprised of mortgage-backed securities that Thornburg would own. *Id.* ¶

97. This idea was very similar in concept to a fund TMST had explored creating in February

2009. *Id.* Starting on April 5, 2009, Goldstone, Simmons and Pell began using TMST's

software and financial research to create materials to establish SAF and attract investors. *Id.* ¶¶

99-100. Goldstone, Simmons, Burns and Pell eventually extracted TMST's financial reports,

investor presentations and related information from its computers and copied the information to

computers they used for SAF's benefit. *Id.* ¶ 101.

    Simmons also engaged the investment banking firm of Friedman, Billings and Ramsey

("FBR") to help raise capital for SAF. *Id.* 102. On or about April 15, 2009, Simmons sent FBR

a business plan that TMST had previously prepared, without compensating TMST or obtaining

TMST's Board approval. *Id.* ¶¶ 102-03.

## VI.    Misrepresentations to TMST's Board

On April 26, 2009, during a special meeting of TMST's Board of Directors conducted over the telephone, that included Goldstone, Simmons, Thornburg and Dempsey, Thornburg finally publicized that some of TMST's officers were considering forming a thrift holding company — SAF — financed by TMAC.  *Id.* ¶ 107.  It is alleged that none of these individuals mentioned to the Board that they had been working on SAF for months, that they had been using TMST assets to do so, or that the recent amendment to the Management Agreement was related to this effort.  *Id.* ¶ 108.  When one board member stated concern that this effort would divert attention and resources that should be devoted to TMST, Goldstone explained that the exploration of this opportunity was being done on their own time and without TMST's resources.  *Id.*  Thornburg then sought a Board resolution that TMAC could pursue this opportunity.  *Id.* ¶ 108.  The Board declined to pass such a resolution.  *Id.*  Instead, the Board resolved that its outside counsel, Venable LLP, and Protiviti, the Board's financial advisors, would review the matter and the Board would consider the issue at the next scheduled meeting on April 28, 2009.  *Id.* ¶ 112.  However, the formation of SAF was not discussed at the April 28 meeting.  *Id.* ¶ 114.  On April 30, 2009, Simmons directed a TMST employee to file a Certificate of Incorporation in Delaware for SAF, which Goldstone signed as President and Chief Executive Officer.  *Id.* ¶ 116.  The certificate was filed on May 8, 2009.  *Id.*

## VII.   SAF Formally Retains Orrick

From March to May 2009, Orrick provided legal services to both TMST and SAF without disclosing its representation of SAF to TMST, the Bankruptcy Court or TMST's Creditors.  *Id.* ¶ 118.  It was not until May 11, 2009, however, that SAF formally engaged Orrick as its legal counsel.  *Id.* ¶ 122.  Even then, Dempsey did not request a waiver from TMST of any

actual or potential conflict. *Id.* She also did not file a supplemental declaration disclosing her dual representation with the bankruptcy court overseeing TMST's case until August 28, 2009, after TMST discovered that she was representing both companies. *Id.*

## VIII.   TMST Absorbs Payroll Costs of Employees Servicing SAF

By the end of April 2009, TMAC terminated all or substantially all of its employees so that TMST could hire them back on a part-time, hourly basis as needed to wind down its business. *Id.* ¶ 129.  Since SAF needed employees, Goldstone, Simmons, Burns and Pell chose which employees TMST would rehire based on SAF's needs. *Id.* It is alleged that on April 29, 2009, Goldstone called employees, by groups, into a series of meetings in TMST's conference room.  The groups were: a) employees who were being terminated, b) employees who were selected to work solely on TMST's bankruptcy-related matters (referred to as "one-hatters"), c) employees who were selected to work on both TMST's bankruptcy-related matters and SAF matters (referred to as "two-hatters"), and d) employees selected to work only on SAF matters. *Id.* ¶ 131.  By May 1, 2009, the petition date, TMST employed approximately twenty-seven one-hatters, fourteen two-hatters and four employees who worked exclusively on SAF work. *Id.* ¶ 132.  Under the initial policy, the two-hatters were told to record their time so that they could be paid by either TMST or SAF as their hours dictated. *Id.* ¶ 133.

During the first two weeks of May 2009, however, Goldstone realized SAF could not afford to pay these employees for their work because SAF was undercapitalized. *Id.* ¶ 134. Goldstone had assumed that he would get the $1.5 million investment SAF needed from Thornburg. *Id.*  On May 13, 2009, however, Thornburg told Goldstone that he had decided not to invest in SAF. *Id.* ¶ 136.  After further discussions, Thornburg agreed to have TMAC lend Goldstone $500,000 in return for 12,650 shares of Goldstone's non-voting common stock in

TMAC, but this was far below the amount SAF needed.  *Id*. ¶ 136.  Realizing that they were

unable to fully capitalize SAF, Goldstone, Simmons and Pell are alleged to have manipulated

TMST's payroll policy so that TMST paid a larger portion of its employees' time dedicated to

SAF work.  *Id*. ¶ 137.  They created a new policy providing that SAF would only pay actual time

a two-hatter recorded as SAF time, with the balance of up to a guaranteed forty hours a week

paid by TMST, even if the employee did not provide TMST services but was only "available for

work."  *Id*. ¶ 139.  Trustee contends that TMST spent approximately $400,000 in non-executive

payroll costs for employees who performed services exclusively for SAF from March 31, 2009

through September 2009.  *Id*. ¶ 144.

<u>STANDARD OF REVIEW</u>

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain a "short and

plain statement of the claim showing that the pleader is entitled to relief."  Rule 12(b)(6) of the

Federal Rules of Civil Procedure authorizes the dismissal of a complaint if it fails to state a claim

upon which relief can be granted; therefore, a Rule 12(b)(6) motion tests the legal sufficiency of

a complaint.  *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).

A complaint must be dismissed if it does not allege "enough facts to state a claim to relief

that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Under the

plausibility standard, a complaint must contain "more than labels and conclusions" or a

"formulaic recitation of the elements of a cause of action."  *Id.* at 555.  Thus, a court considering

a motion to dismiss "can choose to begin by identifying pleadings that, because they are no more

than conclusions, are not entitled to the assumption of truth."  *Ashcroft v. Iqbal*, 129 S. Ct. 1937,

1950 (2009).  Well-pleaded factual allegations contained in the complaint are assumed to be true

"even if [they are] doubtful in fact," but legal conclusions are not entitled to judicial deference.

*See Twombly*, 550 U.S. at 570 (stating that "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation'" (citations omitted)).  Thus, even though Rule 8(a)(2) "marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 129 S. Ct. at 1950.

To survive a Rule 12(b)(6) motion, the legal framework of the complaint must be supported by factual allegations that "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  The Supreme Court has explained recently that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to plead a claim. *Iqbal*, 129 S. Ct. at 1949.  The plausibility standard requires that the pleader show more than a mere possibility of success, although it does not impose a "probability requirement." *Twombly*, 550 U.S. at 556.  Instead, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1937.  Thus, a court must "draw on its judicial experience and common sense" to determine whether the pleader has stated a plausible claim for relief. *Id.*

To the extent there are any allegations of fraud, such allegations must meet the heightened standard of Federal Rule of Civil Procedure 9(b), which requires a pleader to "state with particularity circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).  The United States Court of Appeals for the Fourth Circuit has held that "time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby" are the circumstances that must be plead with particularity. *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008) (quoting *Harrison*

*v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999).  This set of information

is often called the "who, what, when, where, and how" of the alleged fraud.  *Wilson*, 525 F.3d at

379 (internal quotations marks omitted).  For example, a complaint is insufficient if it fails to

allege specific claims submitted to the government and the dates on which those claims were

submitted.  *See United States ex rel. Clausen v. Lab Corp. of Am., Inc.*, 290 F.3d 1301, 1311

(11th Cir. 2002); *United States ex rel. Brooks v. Lockheed Martin Corp.*, 423 F. Supp. 2d 522,

526-27 (D. Md. 2006).  By requiring a plaintiff to plead circumstances of fraud with particularity

and not by way of general allegations, Rule 9(b) screens "fraud actions in which all the facts are

learned through discovery after the complaint is filed."  *Harrison*, 176 F.3d at 789 (citation

omitted).

## ANALYSIS

## I.      Counts I - IV (Avoidance of Fraudulent Transfers)

## A.      Bonus Payments (Counts I & II)

In Counts I and II, Trustee alleges that Defendants Goldstone, Simmons, Burns and Pell

violated Sections 544, 548 and 550 of the Bankruptcy Code (11 U.S.C.) by accepting a total of

$325,000 in unauthorized bonus payments from TMAC as TMST neared bankruptcy and which

TMST later reimbursed.  Sections 544 and 548 provide for the avoidance of transfers of

bankruptcy-estate property, and Section 550 provides that to the extent a transfer is avoided a

trustee may recover the property from a party "for whose benefit [a] transfer was made."

### 1.      Estate Property

Defendants Goldstone, Simmons, Burns and Pell argue that Counts I and II fail because

the bonus payments were paid by TMAC, and therefore do not involve a transfer of TMST's

"estate property" as required by Sections 544 and 548.  In response, Trustee contends that

TMST's subsequent reimbursement of that money should be collapsed into the initial

transaction.  Thus, the payments can be considered part of TMST's "estate property."  Though

the United States Court of Appeals for the Fourth Circuit has not addressed this question, the

United States Court of Appeals for the Third Circuit has held that multi-step transactions can be

collapsed when the steps of the transaction are "part of one integrated transaction." *United States*

*v. Tabor Realty Corp.*, 803 F.2d 1288, 1302 (3d Cir. 1986).  This Court finds instructive the test

created by the United States Bankruptcy Court for the District of Delaware that considers

whether:

1. All of the parties involved had knowledge of the multiple transactions;
2. Each transaction would have occurred on its own; and
3. Each transaction was dependent or conditioned on other transactions.

*In re Hechinger Inv. Co.*, 327 B.R. 537, 546-47 (Bankr. D. Del. 2005).

Trustee contends that Goldstone and Simmons conspired to secretly pay the bonuses to

themselves, Burns and Pell. Compl. ¶ 59.  Trustee also alleges that these payments were made

outside the ordinary payroll, and that TMST reimbursed TMAC for the payments with the

authorization of Goldstone and Simmons. *Id.* ¶ 61.  Having done so, Trustee has sufficiently

alleged that Goldstone and Simmons knew about the bonus payments, that they would not occur

on their own and that the transactions were conditioned upon reimbursement by TMST.  Trustee

has not, however, alleged any facts showing that Burns and Pell knew that the payments were

unauthorized or that TMAC would be reimbursed by TMST.  Thus, this Court finds it

appropriate to collapse the bonus payments made by TMAC and the subsequent reimbursement

by TMST into one transaction as to Goldstone and Simmons, but not as to Burns and Pell.

Accordingly, this Court finds that given their role in authorizing the bonus payments and

ensuring that TMAC was reimbursed by TMST, Trustee alleges a transfer of TMST's estate

property as to Goldstone and Simmons but not as to Burns and Pell.

**2.      Beneficiaries**

Defendants Goldstone, Simmons, Burns and Pell argue that even if the transfer involved estate property, the bonus payments did not benefit them as required by Section 550.  As an initial matter, if the Trustee cannot first avoid a transfer, the recovery provisions of Section 550 do not apply.  Since the Trustee cannot avoid a transfer as to Burns and Pell, the only question is whether the bonus payments are alleged to have benefited Goldstone and Simmons.  As the United States Court of Appeals for the Fourth Circuit holds, "a person must actually receive a benefit from the transfer in order to be an 'entity for whose benefit' the transfer was made." *Terry v. Meredith (In re Stephen S. Meredith, CPA, P.C.),* 527 F.3d 372, 376 (4th Cir. 2008). Here, Trustee alleges that Goldstone and Simmons received a significant monetary benefit in the form of bonus payments worth $140,000 and $92,000 respectively.  Accordingly, Counts I and II are dismissed as to Burns and Pell, but remain as to Goldstone and Simmons.

**B.      Vendor Payments (Counts III & IV)**

Trustee alleges in Counts III and IV that Goldstone, Simmons and SAF Financial, Inc. violated Sections 544, 548 and 550 when they directed TMST to disburse three vendor payments totaling $1,153,000.  Trustee asserts that the payments were made for the sole purpose of ensuring that the vendors would provide their software and services to SAF in the future. Defendants Goldstone, Simmons, and SAF's primary argument that Counts III and IV fail is that none of them were a party "for whose benefit the transfer was made" as required by Section 550. Though there is little case law analyzing the status of a transfer beneficiary, this Court finds instructive the three factor test adopted by the Bankruptcy Court for the Northern District of Illinois.  Accordingly, this Court will consider whether the payments were:

1. Actually received by the beneficiary;
2. Quantifiable; and
3. Accessible by the beneficiary.

*In re McCook Metals, L.L.C.* 319 B.R. 570, 590 (Bankr. N.D. Ill. 2005).

Trustee sufficiently alleges all of the requirements for transfer beneficiary status as to SAF.  As a result of the payments made to the vendors, Trustee contends that 1) SAF received an actual benefit in the form of software licenses and support, 2) the benefit is quantifiable because SAF would otherwise have had to pay for the software and support, and 3) the benefit was accessible through SAF's continued relationships with the vendors.  On the other hand, Trustee does not successfully assert that Goldstone and Simmons were transfer beneficiaries.  Though Trustee repeatedly emphasizes his conclusion that the vendor payments were made for the benefit of SAF, he does not provide any specifics as to how the payments directly benefited Goldstone and Simmons.  Even if this Court found that the individuals obtained a secondary benefit through saving SAF money, such a benefit was not actually received, quantifiable or accessible.

Trustee's secondary argument that SAF was merely the alter-ego for Goldstone and Simmons is wholly unsupported by the allegations in the Complaint.  Since SAF was incorporated in Delaware, that state's law governs any attempt to make an alter ego claim. *Raceredi Motorsports, LLC v. Dart Mach, Ltd.*, 640 F. Supp. 2d 660, 670 (D. Md. 2009).  Under Delaware law, "in order to state a claim for piercing the corporate veil under an alter ego theory, [the Trustee] must show (1) that the corporation and its shareholders operated as a single economic entity, and (2) that an overall element of injustice or unfairness is present." *Trevino v. MersCorp, Inc.*, 583 F. Supp. 2d 521, 528 (D. Del. 2008).  Nowhere in the Complaint does Trustee allege SAF was incorporated for a fraudulent purpose or that Goldstone and Simmons

created a sham entity designed to defraud investors and creditors.  Accordingly, Counts III and IV are dismissed as to Goldstone and Simmons, but remain as to SAF.

## II.     Count VI (Post-Petition Salary Payments)

Trustee alleges in Count VI that after the Petition Date, TMST paid approximately $400,000 in non-executive payroll costs to employees performing services for SAF at the behest of Goldstone and Simmons and for which the debtor received no benefit in violation of Sections §§ 549 and 550 of the Bankruptcy Code.  Trustee therefore seeks judgment in this amount from Goldstone, Simmons and SAF.  Defendants Goldstone, Simmons, and SAF argue that Trustee has not alleged enough facts to establish that they benefited from these payments, thus they cannot be found liable under Section 550.

Applying the same analysis as was applied to Counts III and IV, Trustee's claims are sufficient as to SAF, but not as to Goldstone and Simmons.  Trustee alleges that SAF received a significant, quantifiable and accessible benefit when "various [TMST] employees worked on matters for the sole benefit of NEWCO/SAF, at the expense of [TMST]."  Compl. ¶ 143.  As to Goldstone and Simmons, however, Trustee does not successfully contend that the individuals benefited from these payments which were, by definition, payments for non-executives.  To the extent they arguably obtained a secondary benefit, it was not actually received, quantifiable or accessible.  Accordingly, Count VI is dismissed as to Goldstone and Simmons, but remains as to SAF.

## III.    Count IX (Breach of Contract - Employee Confidentiality Agreement)

Trustee alleges in Count IX that Goldstone, Simmons, Burns and Pell breached TMAC's Employee Confidentiality Agreement by, among other things, preparing agreements and plans for SAF based upon TMST's prior work product.  Though Trustee concedes TMST was not a

party to this contract, he alleges that TMST has standing to enforce it because the contract "was intended for the benefit of TMST, and they were intended third-party beneficiaries of the Confidentiality Agreement." Compl. ¶ 206. Defendants Goldstone, Simmons, Burns and Pell contend that since the contract was between themselves individually and TMAC, TMST did not benefit from it and therefore Trustee does not have standing to enforce it. The parties agree that New Mexico law applies to this issue. The Court of Appeals of New Mexico has held that, "[t]he paramount indicator of third party beneficiary status is a showing that the parties to the contract intended to benefit [a] third party, either individually or as a member of a class of beneficiaries." *Tarin's Inc. v. Tinley*, 3 P.3d 680, 686 (N.M. Ct. App. 1999).

Goldstone, Simmons, Burns and Pell emphasize that under New Mexico law, a party bringing a third-party beneficiary claim must show that the provision was for the party's direct benefit. Every case Movants cite applying New Mexico law is a summary judgment opinion. At this stage, this Court must only determine whether Trustee's allegations "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. TMAC's and TMST's business are alleged to have been intertwined. TMAC ran TMST's business, financial, human resources and day-to-day operations and TMAC obtained its primary source of income from providing these services to TMST. TMST and TMAC have overlapping staff. TMAC's majority shareholder, Garrett Thornburg, was Chairman of TMST's Board of Directors. Goldstone, TMST's CEO and President, and Simmons, TMST's CFO and Vice President, both held equity interests in and were Managing Directors of TMAC. Thus, considering the extent to which TMST and TMAC are closely related and share personnel, Trustee's contention that TMST was an intended third-party beneficiary of a contract made for the benefit of TMAC is a plausible claim for relief. Accordingly, Goldstone, Simmons, Burns and Pell's motions to dismiss Count IX are denied.

**IV.     Count XII (Unjust Enrichment)**

Trustee alleges in Count XII that "Goldstone and Simmons, individually, and with their alter ego SAF" were unjustly enriched by using TMST's work product and assets without paying for their value.  Compl. ¶¶ 223-25.  There appears to be no dispute that New Mexico law governs this issue.

**A.     Goldstone and Simmons**

Goldstone and Simmons counter that this claim should be merged with Trustee's breach of implied contract claims.  In New Mexico, unjust enrichment claims are deemed to be *quantum meruit* claims, i.e. quasi-contract claims.  *Ontiveros Insulation Co., Inc. v. Sanchez*, 129 N.M. 200, 203-04 (N.M. Ct. App. 2000).  Thus, New Mexico courts hold that an unjust enrichment claim is so closely related to a contract action that they should be treated the same.  *See, e.g.*, *Hydro Conduit Corp. v. Kemble*, 110 N.M. 173, 179 (N.M. 1990) ("Actions brought upon theories of unjust enrichment, quasi contract, contract implied in law, and quantum meruit are essentially the same."); *see also Ag Servs. of Am. v. Nielsen*, 231 F.3d 726, 733 (10th Cir. 2000) ("The New Mexico Supreme Court has recognized that the terms unjust enrichment, quasi contract and contract-implied-in-law are interchangeably...") (citing *Kemble*).  Consequently, the U.S. District Court for the District of New Mexico has recognized that a claim for breach of implied contract may be appropriately merged with a related unjust enrichment claim.  *Woodard v. Fid. Nat'l Title Ins. Co.,* 2008 U.S. Dist. LEXIS 108411, at *18 n.1 (D.N.M. Dec. 8, 2008) (noting "that claims for breach of implied contract would merge with their unjust enrichment claims" in New Mexico).  The only remaining breach of contract claim in this case is Count IX for breach of the Employee Confidentiality Agreement.  Trustee's remaining breach of contract claim and unjust enrichment claim seek the same relief against Goldstone and Simmons.  Since

Trustee has an adequate remedy at law through his breach of contract claim, he may not separately seek refuge in equity. *Sims v. Sims*, 930 P.2d 153, 159 (1996) ("equity will not act if there is a complete and adequate remedy at law.").

### B.      SAF Financial, Inc.

In Count XII, Trustee alleges that SAF was unjustly enriched as the alter-ego of SAF. Compl. ¶¶ 223-25.  SAF contends that because Trustee has not adequately pleaded this alter ego claim but merely made conclusory allegations it cannot be found to have benefitted as the alter-ego of Goldstone and Simmons.  As this Court explained in Section I(B), Trustee's argument that SAF is the alter-ego of Goldstone and Simmons is wholly unsupported by the allegations in the Complaint.  Trustee does not allege that SAF was incorporated for a fraudulent purpose or that Goldstone and Simmons created a sham entity designed to defraud investors.  Thus, Trustee's claim that SAF benefitted as the alter-ego of Goldstone and Simmons must be dismissed.

Accordingly, Goldstone, Simmons and SAF's motions to dismiss Count XII are granted, and Count XII is hereby merged into Count IX as to Goldstone and Simmons.

## V.      Count XIII (Civil Conspiracy)

Trustee alleges in Count XIII that Goldstone, Simmons, Burns, Pell and Dempsey engaged in a civil conspiracy to "breach their respective duties of loyalty owed to TMST ... and misappropriate the tangible and intangible assets owed to TMST... in order to benefit themselves and NEWCO/SAF."  Compl. ¶ 229.  During oral argument, the parties agreed that New Mexico's and Maryland's laws on civil conspiracy are virtually the same, therefore it is unnecessary to conduct a choice of law analysis.  Under Maryland law, "a civil conspiracy is a combination of two or more persons by an agreement or understanding to accomplish an unlawful act or to use

unlawful means to accomplish an act not in itself illegal" that results in damage to a plaintiff. *Hill v. Brush Eng'g Materials, Inc.,* 383 F. Supp. 2d 814, 821 (D. Md. 2005) (citations omitted). Thus, a conspiracy is not a tort on its own, but is dependent on some underlying tort that caused injury to the plaintiff. *Estate of White ex rel. White v. R.J. Reynolds Tobacco Co.*, 109 F. Supp. 2d 424, 428 (D. Md. 2000) (citing *Alexander & Alexander, Inc. v. B. Dixon Evander & Assocs.*, 650 A.2d 260, 265 n.8 (Md. 1994)). Furthermore, a clear agreement to conspire is necessary because the "independent acts of two wrongdoers do not make a conspiracy." *Murdaugh Volkswagen, Inc. v. First Nat'l Bank*, 639 F.2d 1073, 1076 (4th Cir. 1981).

### A. Underlying Tort

Defendants Goldstone, Simmons and Dempsey assert that Count XIII should be dismissed as to them because Trustee has failed to plead the required underlying tort against each of them. Though some of the tort claims have been dismissed as to various Defendants, claims for fraud (Counts I and II) remain against Goldstone and Simmons, a claim for breach of standard of care (Count X) remains against Goldstone, and claims for misrepresentation and breach of fiduciary duty (Counts XV through XIX) remain against Dempsey. Thus, Trustee sufficiently alleges that Goldstone, Simmons and Dempsey committed various torts that could form the basis of a civil conspiracy claim.

Defendants Burns and Pell also assert that Count XIII should be dismissed as to them because Trustee has failed to plead the required underlying tort against each of them. As this Court has explained, "a conspiracy, or agreement to do a wrongful act, is not itself a tort; rather, some act *must be committed by one of the parties* in furtherance of that agreement, which is itself a tort, and which injured plaintiffs." *Estate of White v. R.J. Reynolds Tobacco Co*., 109 F. Supp. 2d 424, 428 (D. Md. 2000) (emphasis added). In other words, the tortious act forming the basis

for a conspiracy claim only has to be alleged as to one of the conspirators.  Thus, in order to

maintain a claim for civil conspiracy against Burns and Pell, Trustee must only allege that they

conspired with Goldstone and Simmons to commit fraud, conspired with Goldstone to breach his

standard of care, or conspired with Dempsey to breach her fiduciary duty.

### B.      Agreement

Goldstone, Simmons, Dempsey, Burns and Pell contend that Count XIII should be

dismissed because Trustee has not alleged specific facts showing that Defendants agreed to

commit an unlawful act.  In response, Trustee contends that "a complaint states a claim for civil

conspiracy 'if the allegations are such that [a court] can infer the existence of a conspiracy.'"

Paper No. 34 at 49-50 (citing *Valles v. Silverman,* 84 P.3d 1056, 1064 (N.M. App. 2003)).  To

state a claim for civil conspiracy in Maryland, a plaintiff must allege a clear agreement to

conspire because the "[i]ndependent acts of two wrongdoers do not make a conspiracy."

*Murdaugh Volkswagen, Inc. v. First Nat. Bank of South Carolina*, 639 F.2d 1073, 1076 (4th Cir.

1981).  *See also Cavalier Mobile Homes, Inc. v. Liberty Homes, Inc*., 454 A.2d 367, 372 (Md.

Ct. Spec. App. 1983) (holding that a plaintiff must allege that there was a "unity of purpose or a

common design and understanding, or a meeting of the minds in an unlawful arrangement.").

### 1.      Goldstone and Simmons

Trustee contends that: "[I]n the days prior to the March 29, 2009 Board of Directors

meeting, Messrs. Goldstone and Simmons *secretly conspired* to have unauthorized 'bonuses'

paid to themselves, Ms. Burns and Ms. Pell" and that "*[t]hey agreed*" to the amount of money

that Goldstone, Simmons, Burns and Pell would receive.  Compl. ¶ 59 (emphasis added).  Thus,

Trustee has explicitly pled that Goldstone and Simmons agreed to conspire to accomplish an

unlawful act — fraudulently paying bonuses to themselves and others — as required under Rule

8.

Where, as here, the alleged conspiracy was to commit fraud, the complaint must also abide by Rule 9(b)'s particularity requirements. *Kore Holdings, Inc. v. Rosen (In re Rood)*, 426 B.R. 538, 552 (D. Md. 2010). "The more specific requirements for an allegation of conspiracy are that the pleader provide, whenever possible, some details of the time, place and alleged effect of the conspiracy." *Nat'l Constructors Ass'n v. Nat'l Elec. Contractors Ass'n*, 498 F. Supp. 510, 528 (D. Md. 1980) (internal citations and quotations omitted); *see also Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd.*, 85 F. Supp. 2d 282, 297 (S.D.N.Y. 2000). In this case, Trustee states that Goldstone and Simmons conspired to pay the bonuses "in the days prior to the March 29, 2009 Board of Directors meeting." Compl. ¶ 59. Trustee also specifies that in furtherance of this conspiracy, on March 29, 2009 at 4:00 p.m. Goldstone directed a TMST human resources employee by email to pay the bonuses. *Id.* ¶ 60. These allegations are sufficiently specific to satisfy the heightened pleading requirement of Rule 9(b).

## 2. Dempsey

Trustee makes numerous allegations as to actions Dempsey took in conjunction with Goldstone and Simmons, among others, in furtherance of various unlawful acts. For example, Trustee alleges that Dempsey breached her duty of care, breached her fiduciary duties and committed malpractice by:

> Counseling Goldstone and Simmons regarding the means and methods to secure reimbursement from TMST to TMAC for inappropriate expenses, such as lump sum WARN Act payments when the purpose of such reimbursements was not to benefit her client, TMST, but among other things, to enable Messrs. Goldstone and Simmons to obtain sufficient capital to fund [SAF] for their benefit.

Compl. ¶¶ 240(b), 245(b), 251(b), 258(b), 267(b). Furthermore, Trustee supports his allegations that Dempsey committed malpractice with numerous excerpts from a series of emails between Dempsey, Goldstone, Thornburg and Fish regarding amending the Management Agreement to

ensure that TMST would pay for TMAC's expenses before filing for bankruptcy.  *Id.* ¶¶ 63-88.

Thus, Trustee has sufficiently alleged numerous explicit agreements between Dempsey and

others to commit unlawful acts that damaged TMST.

### 3.      Burns and Pell

In order to maintain a claim for civil conspiracy against Burns and Pell, Trustee must

allege that they conspired with Goldstone and Simmons to commit fraud, conspired with

Goldstone to breach his standard of care, or conspired with Dempsey to breach her fiduciary

duty.   As to the alleged conspiracy to commit fraud, the complaint must abide by Rule 9(b)'s

particularity requirements.  *Kore Holdings,* 426 B.R. at 552.  Trustee has not sufficiently alleged

that Burns and Pell conspired with Goldstone and Simmons to commit fraud by accepting

fraudulent bonus payments from TMAC.  As this Court explained in Section I(A)(1), Trustee has

not alleged any facts showing that Burns and Pell even knew about these payments before they

received them, nor that they knew the bonus payments would be reimbursed by TMST at a later

time.

In order to successfully allege a civil conspiracy to breach standard of care or breach

fiduciary duty, the Trustee must establish that each co-conspirator owed a duty to TMST

recognized by law that rendered him or her "potentially subject to liability for breach of that

duty."  *BEP, Inc. v. Atkinson*, 174 F. Supp. 2d 400, 409 (D. Md. 2001).  Burns and Pell were

both Senior Vice Presidents of TMST, thus both owed appropriate standards of care and were

bound by a fiduciary duty to TMST.   Therefore, they may be parties to a conspiracy to breach

standard of care or fiduciary duty.  *Cf. AP Links, LLC v. Global Golf, Inc.*, 2008 U.S. Dist.

LEXIS 70870, at *13 n. 8 (D. Md. Sept. 2, 2008) (holding that "[s]ince none of the moving

defendants are or were officers, directors, or high-level managers of Global . . . they cannot be

parties to a conspiracy to breach fiduciary duty."). Trustee alleges that after Goldstone and Simmons were aware that TMST was going bankrupt, "They then moved forward with their secret plan to form [SAF] with Ms. Burns, Ms. Pell and Ms. Dempsey." Compl. ¶ 57. Trustee also alleges that Burns and Pell, along with Goldstone and Simmons, used TMST's legal and financial services, TMST's confidential material, and misappropriated TMST's intellectual property for the benefit of SAF. *Id.* ¶¶ 99, 101. Trustee contends that Goldstone, Simmons, Burns and Pell collectively determined which employees TMST should hire back to serve SAF's needs. *Id.* ¶ 129. Trustee also asserts that after realizing that SAF might not get properly funded, "Messrs. Goldstone and Simmons and Ms. Pell immediately began manipulating the payroll policy so that the Debtors began paying for an increasingly larger portion of employees' time dedicated to SAF related functions." *Id.* ¶ 137. These allegations are sufficient to state a plausible claim that Burns and Pell conspired with Goldstone to breach his standard of care, and conspired with Dempsey to breach her fiduciary duty.

Accordingly, the motions to dismiss Count XIII by Goldstone, Simmons, Dempsey, Burns and Pell are denied.

## VI.   Counts XV-XIX (Legal Malpractice and Misrepresentation)

Counts XV through XIX allege claims for legal malpractice, fraudulent misrepresentation and negligent misrepresentation against the law firm Orrick and Dempsey. In their joint motion, Orrick and Dempsey "move to dismiss, or in the alternative to strike" these counts "to the extent that they assert claims that seek to recover as purported 'damages' what are in reality disguised claims for fraudulent transfers."[2] Paper No. 30 at 14. Motions to strike under Rule 12(f) are

---

[2] During oral argument, Orrick and Dempsey's counsel stated that "we make no motion with respect to Counts XV through XIX." Hearing Tr. p. 126, lines 19-21. Counsel further explained that "[t]he only counts remaining as to which we have moved to dismiss - or, in the alternative, to stay - is Count XX." *Id.* p. 127, lines 3-5. Accordingly, in the post-hearing Order issued on

disfavored and "should be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties." *Schultz v. Braga*, 290 F. Supp. 2d 637. 654-55 (D. Md. 2003). Rule 12(f) only permits the striking of "any redundant, immaterial, impertinent, or scandalous matter." Dempsey and Orrick's only argument as to why this Court should strike Counts XV through XIX appears to be that they are redundant in that they repeat Trustee's fraudulent transfer claims. These counts are distinct from the fraudulent conveyance claims both in name and in substance. *See, e.g., Cohen v. Morgan Schiff & Co., Inc. (In re Friedman's Inc.)*, 394 B.R. 623, 628-29 (S.D. Ga. 2008) (holding that legal malpractice and fraudulent conveyance claims are not duplicative because they rest on different legal standards). Accordingly, Orrick and Dempsey's motion to strike Counts XV through XIX is denied.

CONCLUSION

For the reasons stated above, Defendants' Motions to Dismiss (Paper Nos. 25, 27, 29 & 30) are GRANTED IN PART, and DENIED IN PART, specifically:

---

September 20, 2010, this Court determined that Orrick and Dempsey's Motion to Dismiss was withdrawn as to Counts XV through XIX. Paper No. 58. Later that day, Orrick and Dempsey's counsel filed a letter with this Court stating:

> In reflecting upon the hearing that took place… last Friday, I realize I may have created some confusion about whether [Orrick and Dempsey] had filed any motion directed to Counts XV-XIX of the Complaint. In fact, Orrick [and Dempsey] did *move to strike* portions of those Counts (as well as Counts XI, XIII and XIV) on the ground that those claims are disguised fraudulent transfer claims that cannot be pursued against Orrick.

Paper. No. 57 (emphasis added). Thus, it appears that Orrick and Dempsey are solely moving to strike — not to dismiss — Counts XV through XIX. Considering Counsel's misleading and confusing statements at the hearing and that this Court would prefer to have heard argument from both parties on these issues, this Court would customarily have its Order stand and consider all of Orrick and Dempsey's arguments as to these counts withdrawn. Nonetheless, since the arguments have been fully briefed by all the appropriate parties, this Court will address the merits of Orrick and Dempsey's motion to strike.

1.      The Motion to Dismiss by  Defendants Burns and Pell (Paper No. 25) is

        GRANTED as to Counts I and II (Avoidance of Fraudulent Transfers - Bonus

        Payments);

2.      The Motion to Dismiss by Defendants Goldstone and Simmons (Paper No. 29) is

        DENIED as to Counts I and II (Avoidance of Fraudulent Transfers - Bonus

        Payments);

3.      The Motion to Dismiss by  Defendants Goldstone and Simmons (Paper No. 29) is

        GRANTED as to Counts III and IV (Avoidance of Fraudulent Transfers - Vendor

        Payments);

4.      The Motion to Dismiss by  Defendant SAF Financial, Inc. (Paper No. 27) is

        DENIED as to Counts III and IV (Avoidance of Fraudulent Transfers - Vendor

        Payments);

5.      The Motion to Dismiss by Defendants Goldstone and Simmons (Paper No. 29) is

        GRANTED as to Count VI (Post-Petition Salary Payments);

6.      The Motion to Dismiss by Defendant SAF (Paper No. 27) is DENIED as to Count

        VI (Post-Petition Salary Payments);

7.      The Motions to Dismiss by Defendants Goldstone and Simmons (Paper No. 29)

        and by Burns and Pell (Paper No. 25) are DENIED as to Count IX (Breach of

        Contract - Employee Confidentiality Agreement);

8.      The Motions to Dismiss by Defendants Goldstone and Simmons (Paper No. 29)

        and by SAF Financial, Inc. (Paper No. 27) are GRANTED as to Count XII

        (Unjust Enrichment), and Count XII is hereby merged into Count IX (Breach of

        Contract) as to Goldstone and Simmons.

9.      The Motions to Dismiss by Defendants Goldstone and Simmons (Paper No. 29),

by Dempsey (Paper No. 30), and by Burns and Pell (Paper No. 25) are DENIED

as to Count XIII (Civil Conspiracy); and

10.     The Motion to Strike by Orrick and Dempsey (Paper No. 30) is DENIED as to

Counts XV through XIX (Legal Malpractice and Misrepresentation).


 A separate Order follows.

Dated:          October 14, 2009            /s/_____

                                            Richard D. Bennett
                                            United States District Judge